588 A.2d 1303

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**James JOHNSON, Appellant.**

Supreme Court of Pennsylvania.

Oct. 22, 1990.

Decided April 4, 1991.

Reargument Denied June 3, 1991.

hearing, imposition of sentence and review by this Court to the Governor.   42 Pa.C.S. § 9711(i).

Stanley M. Shingles, for appellant.

Gaele McLaughlin Barthold, Deputy Dist. Atty., Ronald Eisenberg, Chief, Appeals Div., Helen Kane, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION

CAPPY, Justice.

The issue before this Court is whether trial counsel was ineffective in failing to object, during closing argument, to the prosecutor's characterization of appellant as a liar.  We

find that this claim of ineffectiveness is without merit and, therefore, affirm the order of the Superior Court. 382 Pa.Super. 643, 549 A.2d 1340.

Following a trial by jury, appellant was convicted of rape[1] and criminal conspiracy[2]. Trial counsel filed timely post-verdict motions, however, prior to any ruling thereon, appellant filed a *pro se* motion alleging ineffective assistance of counsel. Trial counsel was granted leave to withdraw and new counsel was appointed who filed supplemental post-verdict motions which included claims of ineffective assistance of trial counsel. An evidentiary hearing was held, following which the trial court denied the post-verdict motions and imposed a total sentence of eight to sixteen years incarceration. The Superior Court affirmed the judgment of sentence. This appeal by allowance followed.

Appellant and the victim essentially agree on the following preliminary facts surrounding the incident: On June 19, 1982, the victim, who was then sixteen years old, left her home to meet Lena Goode with whom she planned to attend a neighborhood party. On their way to the party, the two girls met appellant, his brother, Wayne, and appellant's friend, Rick Ellis and invited them to attend the party. The five proceeded to the party together, spent the majority of the time with one another while at the party and left the party together. After leaving the party, appellant drove the group to a lounge where they stayed until approximately 2:00 a.m. Appellant next drove the group to North Philadelphia. It was the victim's testimony that appellant intentionally passed by the street where she lived because he wanted to take his brother Wayne home first. However, a few minutes later appellant stopped the van at 24th and Berks Street whereupon Lena Goode and appellant exited the van, ostensibly to go to the restroom. The victim, Mr. Ellis and Wayne remained in the van. It is at this point that appellant's version and that of the victim diverge significantly.

1. 18 Pa.C.S. § 3121.
2. 18 Pa.C.S. § 903.

The victim testified that when Lena and appellant failed to return in a few minutes, she and Rick left the van to look for them. They entered a nearby house, which was later determined to be appellant's residence, where they encountered appellant who directed them to a bedroom on the second floor where he claimed they would find Lena. The victim testified that upon entering the bedroom, appellant pushed her onto a mattress and raped her while Rick Ellis stood there pointing a gun at her demanding that she let appellant do as he wished. When appellant finished, Rick Ellis also raped her.

While Rick was raping her, the victim heard Lena call her name, whereupon appellant ran from the room and Rick got off of her, told her to dress, and threatened her if she told anyone about what had just occurred. After leaving the house, she saw Lena and appellant approaching her but was unable to tell Lena what had occurred because she was crying and having trouble breathing, apparently due to a pre-existing asthma condition.

The five of them then got back into the van and drove away, but within a few minutes, Rick Ellis announced that he wanted out of the van because he was annoyed at the victim's hysterical behavior. Appellant then stopped at a restaurant, at Lena's request, to get some tissues for the victim.

After appellant exited the van, the victim saw her step-brother across the street and she and Lena ran to him. She was still unable to communicate what exactly had occurred at the house, but, did manage to tell him that it had something to do with the people in the van. Upon seeing the girls talking and pointing in his direction, appellant took off in the van. The step-brother summoned a taxi for the two girls after the victim refused his offer to take them to the police. However, upon seeing the victim's state, the cab driver stopped a police officer who was passing by, who then took the victim to a hospital.

Appellant, on the other hand, denied having any sexual contact with the victim. Rather, he maintained that he and

Lena had gone into his house and engaged in consensual sex while the others remained in the van. He testified that when he and Lena returned to the van, the victim and Rick were not there so he and Lena retraced their steps to look for them. Thereafter, they saw the victim and Rick walking towards them from a nearby housing project. The victim asked appellant if she could use his bathroom and both she and Rick went into appellant's house. According to appellant's testimony, nothing remarkable happened while the victim was in his presence except that she was noticeably upset as they were driving to the restaurant.

During closing argument, the prosecutor first summarized the testimony of each of the Commonwealth's witnesses. He then addressed appellant's testimony, concluding that it did not fit with the other evidence presented and repeatedly stated that appellant had lied. Appellant argues that, in making these comments, the prosecutor improperly expressed his personal belief as to appellant's credibility and that, therefore, trial counsel was ineffective for not objecting to that portion of the Commonwealth's closing.

In reviewing a claim of ineffective assistance of counsel, we must first determine whether the issue underlying the claim has arguable merit. *Commonwealth v. Evans,* 489 Pa. 85, 413 A.2d 1025 (1980). If the claim lacks merit, our inquiry ceases, as counsel will not be deemed ineffective for failing to pursue a baseless or meritless issue. *Commonwealth v. Nelson,* 514 Pa. 262, 523 A.2d 728 (1987). If, however, the claim has merit, we must then determine whether the course of action chosen by counsel had some reasonable basis designed to effectuate his client's interests. *Commonwealth v. Hentosh,* 520 Pa. 325, 554 A.2d 20 (1989). Finally, appellant must show that counsel's ineffectiveness so prejudiced his case that he was denied a fair trial. *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987).

It is well settled that a prosecutor is not permitted to express a personal belief as to the defendant's guilt or

innocence or as to the defendant's or other witness' credibility. *Commonwealth v. Carpenter*, 511 Pa. 429, 515 A.2d 531 (1987). In *Commonwealth v. Bricker*, 506 Pa. 571, 487 A.2d 346 (1985), we held that it was reversible error for the prosecutor to state, during cross-examination of a defense witness, that the witness "lied." However, in *Bricker* there was no basis whatsoever for the prosecutor's remarks. In other words, the evidence presented in that case did not support an inference that the witnesses had lied. Similarly, in *Commonwealth v. Harvey*, 514 Pa. 531, 526 A.2d 330 (1987) which was a non-jury case, we noted that had the case been tried by a jury, the prosecutor's remarks, both during cross-examination of the defendant and in the course of his closing argument, would have constituted reversible error since the remarks were completely unsupported by the record.

Here, the prosecutor's comments that appellant had lied were given in response to defense counsel's comments regarding the credibility of the victim and were supported by the evidence. During closing argument, defense counsel stated as follows:

Now, what type of facts did you hear in this case?

You heard two conflicting stories.

So how are you going to determine who's telling the truth?

Well, it's tough because when a person's on that witness stand and telling a lie, a bell doesn't go off to let you know they're lying. Just the same as when they're telling the truth, the light doesn't come out and shine upon them, so how do you determine whether someone's telling the truth or telling a lie?

You have to use your common sense. You take your everyday experiences, and that's why you were selected as jurors, because you have common sense, everyday experiences, and how to judge the witnesses.

Now, take your everyday experiences, and let's see how Deirdre Hayes testified in this case. She got on that witness stand and she was shaking. She was upset.

Use your experience. Think back, when you're trying to deceive somebody and you're being confronted with them one on one, how you feel that knot in the pit of your stomach and how it grows, and how you shake, and how you feel nauseated, and then also think of how when you have to go up on that witness stand and take an oath to tell the truth before God, and you're testifying before God, and you're testifying before a Judge such as Judge Clarke and 14 people, two attorneys, and the person that you're telling that lie about.

How are you going to feel? How would you react?

Isn't that also consistent with the way Miss Hayes acted on that witness stand? Isn't that also consistent?

You saw Miss Hayes. You saw her testify. Do you think she acted that way when she was meeting the young men?

Use your common sense. Think about it when you're going through and reviewing the testimony.

Now, I'm not going to review all of the testimony with you. I don't think it's possible to review it all or even proper because just last week is when you heard the case. It's just two days, so most of the evidence is still fresh in your mind, but there are a few facts and a few gaps, and a few failures to ring of truth, as Mr. McGettigan told you, a ring of truths that are problems with Miss Hayes' testimony.

In response, the prosecutor first reviewed the Commonwealth's evidence and then made the following comments:

I submit to you that Mr. Wilkins is truthful and the defendant lied, and he lied to you from beginning to end of his testimony.

He lied to you when he said he was in Philadelphia all the time after this event.

He lied to you when he said he was driving towards the Germantown area with Wayne and Lena and Deirdre just because he thought that would be a good idea, and what did he tell you from that witness stand?

He told you that Wayne was concerned, I was concerned, Deirdre was hysterical, and her friend got hungry so we went to get something to eat.

That's what he told you: I was concerned.

Was he concerned when he wrote this letter? He was concerned. He was very concerned when he came out of that Steak and Eggs and he saw Deirdre talking to her brother, and his concern, I submit to you, was the same concern that he had throughout that entire night, concern with himself, and as he testified: I didn't know what she was telling her brother.

I submit to you he knew what she was telling her brother. She was telling her brother of what he had done, but he didn't want to get involved.

His concern apparently for Deirdre Hayes ended then, and he's gone.

And he testified then he went to Mount Holly and he—or he took Sylvia, and he went back to 1932 North 24th Street, but that was later, and he said it wasn't his face in that window.

He says that Officer Keenan's wrong and Officer Merritt's wrong, and Deirdre Hayes is wrong, and her mother is wrong, and it wasn't his face, but he doesn't tell you—he doesn't know whose face it was in his house with Sylvia, the mother of his children, doesn't know.

Not my face, he says. That's what the defendant tells you.

For you to believe that, you have to believe that Officer Merritt's lying, Deirdre Hayes is lying, Officer Keenan's lying, and Mrs. Harris lying; Mrs. Harris, who I submit to you, testified with the candor and truthfulness of a mother of a victim.

That's some of the testimony of the defendant's that you're going to have to weigh and judge the truthfulness and credibility of.

But there's so much more of the defendant's testimony; his testimony as to having what he called an affair, and if I recall his response to my question, "How long did this

last," well, he used the word "ordeal." He said, "This ordeal lasted about a half an hour."

Well, I submit to you that's a slip of the tongue. He's not talking about his ordeal. He's talking about Deirdre Hayes' ordeal, or else he has a strange word for an affair which is a strange word for what he did, and I submit to you that what he did was a violent, criminal act that's called sex only in the broadest terms, broadest definitions, and it's violent.

But the defendant testified that he didn't know anything about this; he had an idea the police were after him, and he testified: That they didn't have no warrant or nothing so I wasn't looking for them.

And I submit to you then he fled. He fled this jurisdiction because he knew. He knew what he was wanted for and why he was wanted, and knew what would happen to him when he was caught because he wasn't seen again until Officer Merritt arrested him on the 24th of April of 1984.

And he never quit his job. He just abandoned the van and his job and his check and his house, and the mother of his children, and his children, and he fled the jurisdiction. And he fled because of what he did.

And he sat there before you and testified under oath, under oath, moments before another witness would come in and say: That's a lie, and he drew you a map. He drew you a map to demonstrate how this couldn't happen and that couldn't happen, and he did that right after she told you what did happen.

I don't have that much more to say. This is not testimony. I can't add or detract from what any of the witnesses said by testimony.

I certainly can't add to or detract to what Deirdre told you. If the words existed for Deirdre to say to make this event not have occurred, I submit to you she would have said them.

If her mother knew the words that she could say that would make this event not have occurred, would her

mother say them? If I knew the words that would make this event not have occurred, would I be a human being if I did not say the words that would make that rape of Deirdre Hayes not have occurred?

But the facts are the facts. The testimony demonstrates she was raped and he did it and stood up here, and I submit to you he gave you lie after lie after lie, and he had an answer for everything.

But when you look, even the most superficial response of the defendant, you see lie, you see lie, you see lie.

While the prosecutor did state during his closing argument that appellant had lied, when taken in context and after review of all of the evidence, it becomes clear that his remarks were neither unfair nor prejudicial. Clearly, the outcome in this case involved a credibility determination by the jury. The victim and appellant were the only two who testified regarding the events of that evening despite the fact that there were three other people present during most of the evening. The jury was acutely aware that the victim's and appellant's stories conflicted. Even the trial judge, during a side bar conference, commented that the case would rest on a credibility determination between appellant and the victim. Moreover, it was defendant's counsel who first commented on the credibility of the witnesses. Indeed, defense counsel quite clearly indicated his belief that one of the prosecution witnesses was in fact lying. The prosecutor then responded to this attack on one of the Commonwealth's witnesses. Given these circumstances, it would be difficult to conceive of any other approach when closing to the jury than that employed by the prosecutor here. Viewed in this context, the prosecutor's comments were neither unfair nor prejudicial, but, merely reinforced the fact that the jury had been presented conflicting stories. Because appellant's claim lacks merit, we cannot find counsel ineffective for failing to object to these remarks. *See, Commonwealth v. D'Amato,* 514 Pa. 471, 526 A.2d 300 (1987).

The Superior Court found that the remarks were not improper nor prejudicial noting that the prosecutor, in arguing to the jury that appellant's version of the facts was untrue, employed the terms "I submit." While this Court agrees that the comments made in the instant case were not prejudicial given the atmosphere of the entire trial, we do not today hold that the mere use of the terms "I submit" necessarily cures an otherwise prejudicial remark. To reiterate, we conclude only that because of the unusual circumstances presented in the instant case, the prosecutor's comments were neither unfair nor prejudicial. In so holding, we do not wish to sanction the use of the terms, "you lied." A prosecutor must act properly during the entire trial. His or her conduct during trial should neither be vindictive nor should he or she attempt in any manner whatsoever to influence the jury by arousing their prejudices.

Accordingly, we affirm the Order of the Superior Court.

McDERMOTT, J., did not participate in the consideration or decision of this matter.