660 A.2d 68

COMMONWEALTH of Pennsylvania,

v.

Kevin THOMPSON, Appellant.

Superior Court of Pennsylvania.

Submitted Jan. 23, 1995.

Filed May 9, 1995.

Reargument Denied July 10, 1995.

John T. Drost, Philadelphia, for appellant.

Kathy L. Echternach, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before OLSZEWSKI, JOHNSON, and BROSKY, JJ.

OLSZEWSKI, Judge:

In the evening of August 14, 1991, Charles Jones witnessed a robbery taking place in the alley behind his Walnut Street home in Philadelphia. Stepping out onto his second-story porch, Mr. Jones noticed an old man lying face down in the alley, and a younger man standing over him, striking him with a piece of brick. Mr. Jones cried out, and the assailant looked

up and fled. The victim turned out to be his 84–year–old, neighbor Morris Dailey. Mr. Jones's wife called the police.

Mr. Jones gave a description of Mr. Dailey's assailant to the police, and then went to the hospital to check on his neighbor. The rather generic description (black male, about 5′ 10″ or 11″, around 140 to 150 pounds, wearing blue pants and shirt) went out on police radio. Half an hour later, a patrol car found a man who fit the description less than a block away from the alley where the incident occurred. The police picked up the suspect, appellant Kevin Thompson, handcuffed him and put him in the back of their patrol car. They drove to the hospital and brought Mr. Jones down to the parking lot for a one-on-one presentation. While an officer shined his flashlight on the suspect in the back of the car, Mr. Jones looked through the glass and positively identified Thompson as the man he had seen hitting Mr. Dailey with the brick. Thompson was charged with robbery.

The assault left Mr. Dailey with some nasty lacerations and two subdural hematomas. Still, Mr. Dailey recovered sufficiently to be discharged from the hospital five days after his assault. He testified at Thompson's preliminary hearing that a man tried to take his wallet, and beat him with a brick when he refused. Mr. Dailey did not identify Thompson at the preliminary hearing, however. Soon afterward, Mr. Dailey's health began to decline, and he went to live with relatives in Ohio. By the late autumn of 1991, he contracted pneumonia and died. The Butler County, Ohio, coroner opined that Mr. Dailey's decline in health and eventual death were a direct result of the subdural hematomas caused by Thompson's assault.

Thompson's charge was amended to include homicide. He was tried and found guilty of second-degree murder and robbery by a jury in May of 1992. After his post-verdict motions were denied and he had been sentenced to the mandatory term of life in prison, Thompson's privately retained counsel withdrew and present counsel was appointed for this appeal.

## I.

█ Thompson raises two issues, and we will address the second one first. Thompson argues that the Commonwealth failed to prove beyond a reasonable doubt that he caused Morris Dailey's death. Since Mr. Dailey did not immediately die from the assault, the Commonwealth must prove that his being bludgeoned with the brick started an unbroken "chain of causation" which led to his death. *Commonwealth v. Rementer*, 410 Pa.Super. 9, 598 A.2d 1300 (1991), *alloc. denied*, 533 Pa. 599, 617 A.2d 1273 (1992).

The Commonwealth proved causation with the testimony of two expert medical witnesses. Dr. Richard Kauder, who treated Mr. Dailey after the assault, testified that in addition to lacerations and multiple fractures, the beating left Mr. Dailey with two subdural hematomas—blood clots on the surface of his brain. Over time, the hematomas would allow blood to collect and exert pressure on Mr. Dailey's brain, which would in turn result in a decline in health and other complications. Mr. Jones testified that after the attack, Mr. Dailey's health did indeed deteriorate to the point where he could no longer care for himself.

At this point, Mr. Dailey's sister came to take him back to Ohio, where he soon died of pneumonia. Dr. Richard Burkhardt, the Ohio coroner who autopsied Mr. Dailey, testified that Mr. Dailey's pneumonia resulted from his debilitated condition, which in turn resulted from the subdural hematomas left by Thompson's assault with the brick. The jury, as fact-finder, was entitled to believe this properly admitted expert medical testimony and find causation. *See Commonwealth v. Paquette*, 451 Pa. 250, 253, 301 A.2d 837, 839 (1973) (jury may find, upon proper expert medical testimony, that subdural hematoma caused victim's pneumonia and eventual death). We have no basis for invading the exclusive province of the fact-finder, and Thompson suggests no reason for disturbing its decision.[1]

1. We also note that at the hearing on post-trial motions, Thompson's counsel essentially admitted that a pathologist who he had asked to

## II.

Thompson's other claim is that his trial counsel ineffectively represented him by failing to object to the prosecutor's improper and inflammatory remarks during her closing argument. To appreciate the context of these remarks, we must first review the development of this case.

The sum of the evidence against Thompson consisted of a single presentation identification, when the police brought Mr. Jones to their patrol car, pointed to the handcuffed suspect inside and asked, "Is this the man?" The Commonwealth produced testimony from Mr. Jones, the police officers who picked up Thompson, and the statement of Mr. Dailey at Thompson's preliminary hearing that the person who had beaten him with the brick was trying to rob him.

Thompson presented numerous alibi and character witnesses, including his boss, Roosevelt Cochran, who ran a contracting business. During cross-examination, the prosecutor revealed that Cochran had a previous robbery conviction and lacked a Philadelphia contractor's license. Thompson also took the stand in his own defense. Thompson testified that he was in the area of the crime that day because he was working on a stucco job for Cochran. He contended that he was the victim of mistaken identification.

### A. Credibility of Witnesses

At closing arguments, the defense reviewed the character and alibi witnesses who had testified for Thompson, and submitted the possibility of misidentification to the jury. Defense counsel specifically did not challenge Charles Jones's credibility as a witness, but only questioned the accuracy of his identification. "I'm not saying [Mr. Jones] is not a believable witness. I'm only saying is he an accurate witness?" N.T. 5/11/92 at 132. Defense counsel also argued that just because a witness offers an alibi for defendant does not necessarily make the witness less credible. With regard to Thompson's

review the trial record could find no medical basis for challenging the jury's finding on causation. N.T. 10/14/93 at 13–14.

mother and sister, who offered a partial alibi for Thompson, defense counsel stated:

> True, these witnesses were related to the defendant in many respects, but when you deliberate, I'd like you to consider the honesty or lack of honesty concerning these alibi witnesses.

> \* \* \* \* \* \*

> Now true, these are relatives, mother, sister, no question about that. But as you watch them, as you heard them, did they appear to you to be trying to hide something? Did they have a certain believability about them?

*Id.* at 125, 140.

The Commonwealth mischaracterizes these remarks as attempts to destroy Mr. Jones's credibility, and bolster the alibi witnesses' credibility. As the Commonwealth puts it:

> . . . Counsel then directly suggested that Jones was not "an accurate witness" ([N.T. 5/11/92 at 132] ).

> Defense counsel went on to contrast Jones' supposedly poor believability with what he believed was the "certain believability" of defendant's mother and sister (*id.*, 140) and the [sic] "the honesty" of his alibi witnesses (*id.*, 125).

Commonwealth's letter brief at 11.

Having taken defense counsel's remarks entirely out of context, the Commonwealth contends that these remarks "opened the door" on the issue of witness credibility, so that the prosecutor was entitled to reply in kind. *Id.* In her own remarks which followed, the prosecutor argued:

> And I submit to you that all of you have listened to the testimony in this case when you heard Charles Jones describe what happened on August 14th, and you heard his words and you watched him testify, and you saw his face and you saw the way he acted. You knew the words were real, you knew he was giving you the truth.

> I submit to you, in your heart, in your mind, when you listened to it, you knew it was real and you knew it was true. When you heard the testimony of Dr. Burkhardt say

to you that there was no doubt in his mind that the reason why Morris Dailey is dead today is because of the chain of events that started it. Yes, he died from pneumonia. But the reason why he was in the hospital to get pneumonia was because he had been hit in the head with a brick. The words were real. They were true. Your common sense told you it made sense.

I submit to you further, that when you have listened to the testimony that came from the stand on the behalf of the defendant, it made no sense. It did not have the ring of truth. If you hear that testimony and those people said those things to you in your homes or at work, you would not believe what they said to you. Because your ears could not believe what you were hearing. The defense in this case makes no sense.

N.T. 5/11/92 at 150–153.

■ It is well settled that the prosecution may not express her personal belief as to witnesses' credibility, but may only argue that the evidence presented supports an inference that a witness did or did not tell the truth. *Commonwealth v. Johnson*, 527 Pa. 118, 122, 588 A.2d 1303, 1305 (1991). A prosecutor may not insulate an otherwise improper remark merely by prefacing it with the words, "I submit to you." *Id.* at 126, 588 A.2d at 1307. Of course, a prosecutor is entitled to respond to credibility comments of defense counsel. *Commonwealth v. Barren*, 501 Pa. 493, 497, 462 A.2d 233, 235 (1983) (credibility comments permissible when motivated by defense's prior attacks on Commonwealth's witnesses' credibility); *Johnson, supra* (prosecutor will be given more latitude in closing remarks in order to respond to defense counsel's arguments).

■ There can be no question that any improper prosecutorial remarks cannot be justified as a fair response to similar arguments by the defense. Here, the defense made no claims about who was credible or who was telling the truth, despite the Commonwealth's specious attempt to put that spin on the record. Rather, we must address the prior question of wheth-

er the prosecutor improperly injected her personal beliefs when she bluntly told the jury that they should believe her witnesses and not Thompson's, because her witnesses were telling the truth and Thompson's were not.

We must disagree with Thompson that such an argument is tantamount to the prosecutor expressing her personal beliefs. The prosecutor began by arguing that Charles Jones was worthy of belief because his demeanor on the stand comported with a person telling the truth. So long as the prosecutor's credibility comments are based on observable events at trial, such as testimony and other evidence, they will be permitted. *Barren, supra.*

After discussing why she thought Mr. Jones's demeanor made him a credible witness, the prosecutor continued to make assertions about the truth value of testimony, although now without even trying to base them on the evidence. The prosecutor's assertions, however, were just that—bald assertions. They were not statements of her personal opinion. The prosecutor did not try to prove the truth of certain testimony by telling the jury that she believed it was true, since the jury would likely credit the Commonwealth's attorney as a persuasive authority on such matters. Rather, the prosecutor argued that her witnesses were telling the truth because their testimony corresponded with reality. Of course, the question of what really happened was for the jury to decide. In asserting the truth of her own witnesses' testimony and the falsity of Thompson's, the prosecutor was merely stating an obvious point which she had implicitly argued all along, and upon which the entire trial hinged: that the Commonwealth's version of events was true, and Thompson's version was not. The tautological bluntness of such an argument may be surprising, but it is not improper.

### B. Inflammatory Remarks

■ The prosecutor ended her summation thus:

Morris Dailey cannot rise from the grave and say to you what happened to him. The only person who can speak for him to you is me. And I am his voice. And I ask you for

justice. I ask you to answer for his death, to make the man who did this responsible. He lived in this city with no family. The only family he had was Charles Jones, who did what any son or brother would do. We are his family now. You are his brothers, you are his sisters, and you are his grandchildren. He is the grandfather that we knew growing up. And I ask, ladies and gentlemen, to hold this man here accountable . . .

N.T. 5/11/92 at 170.

Thompson argues that these remarks served only one purpose: to inflame the passions of the jury. The defense in this case never tried to downplay the gravity of the crime, or its brutal nature. Thompson's defense was mistaken identification. Hence, Thompson contends that the prosecutor's references to the victim, to herself as the victim's voice, and her plea that the jurors consider the victim as a close relative were a wholly unwarranted and improper appeal to the jury's emotions. *See Commonwealth v. Bricker*, 506 Pa. 571, 585, 487 A.2d 346, 353 (1985).

In its appellate brief, the Commonwealth offers two spurious excuses for the prosecutor's choice of rhetoric. It contends that the prosecutor did not focus her improper rhetoric on the defendant because she only asked the jury "to make the man who did this responsible." Commonwealth's brief at 25. Of course, only six sentences later in her summation, the prosecutor asked the jury "to hold this man here accountable," just as she had previously in the closing argument. *See, e.g.*, N.T. 5/11/92 at 149.

The Commonwealth also argues that the remark "that the jurors were now [the victim's] family was a proper reply to defendant's attempt—entirely unsupported by the evidence— to blame the victim's death on his family (*id.*, 138)." Commonwealth's brief at 23. As with the earlier remarks on credibility, a review of defense counsel's closing reveals that he said no such thing:

Now, the man died from bronchial pneumonia. No question he was in a weak condition. Is there clear enough evidence

that you can prove beyond a reasonable doubt that he died late November of 1991 as a result of the attack that took place three months earlier? If he had been a younger man, it might have been more understandable. But amongst the elderly, a lot of things could have happened that his family didn't know about when he was in his home, when he was trying to take care of himself.

So you've got to conclude, you've got to conclude, after having heard the medical testimony, whether it was clear cut enough for you to determine beyond a reasonable doubt that the man died as a result of this attack. Because the death certificate has the primary cause of left bronchial pneumonia.

N.T. 5/11/92 at 137–38. As the record reveals, defense counsel was only questioning the sufficiency of the Commonwealth's causation evidence. He never tried to blame Morris Dailey's death on his family. The prosecutor's closing rhetoric was not a response to any argument proffered by defense counsel, despite the Commonwealth's attempts to distort the record. Thus, the "I am his voice" and "you are his grandchildren" lines must stand or fall on their own.

We do not think, however, that such rhetoric crosses the bounds of permissible advocacy. It may well have been chosen by the prosecutor to play to the jury's sympathy for the victim and secure a conviction. At the same time, we think it falls within the wide latitude which our high court has countenanced as acceptable rhetorical flair in a closing argument. *Cf. Commonwealth v. Marshall*, 534 Pa. 488, 500–04, 633 A.2d 1100, 1106–07 (1993) (prosecutor's plea that the jury "close the eyes of the dead" victims with their verdict held permissible).

## C. Defense Strategy

 Thompson also argues that the prosecutor improperly disparaged defense counsel's strategy. After reviewing the record, we agree with Thompson that some of the prosecutor's remarks were intemperate, *e.g.*, "You should be insulated by that kind of defense tactic." *Id.* at 168. We must acknowl-

edge, however, that they were fair responses to the arguably inconsistent defense strategy of challenging both the commission of the crime and causation, and also to defense counsel's implication that Morris Dailey was asked but failed to identify Thompson at his preliminary hearing. The defense is always entitled to argue in the alternative, but should expect that such a tactic will not go without some comment from the prosecution.

We now turn to two passages of the prosecutor's closing which were wholly improper.

### D. Character Witnesses

In the course of his defense, Thompson put numerous character witnesses on the stand. The best of these witnesses was Ms. Edith Goodman, a college-level math teacher. She testified that she had known Thompson since he was a baby, that he was not a violent person, and that he would often do handyman-type jobs for elderly people in the neighborhood for a few dollars. N.T. 4/8/92 at 41–44. On cross-examination, the prosecutor established Ms. Goodman did not know about Thompson's doings outside of her neighborhood, and that she was not offering an alibi for him. *Id.* at 44–46. This was the extent of the short cross-examination.

In her closing, the prosecutor tried to undercut Ms. Goodman's credibility by arguing that she did not know that Thompson worked for a contractor with a prior robbery conviction and no contractor's license:

> She's a nice woman, but she doesn't know anything about this man when he leaves that block, she doesn't know who his friends are. She does not know what he was doing on August 14th. She does not know that he works for a man who's been convicted of robbery. She does not know that he works for a man who has no license to work in Philadelphia.

N.T. 5/11/92 at 165.

Of course, the prosecutor had never asked Ms. Goodman if she knew anything about Thompson's employer. Thus, while

the first two sentences of the above remark were permissible, the last two sentences have no basis in the evidence. Supplying answers to unasked questions is not a proper method of challenging a character witness's knowledge of the defendant.

■ We also note that the issue of Roosevelt Cochran's criminal record and lack of a contractor's license was relevant for the sole purpose of cross-examining him. In her closing argument, the prosecutor was entitled to mention Mr. Cochran's record only when discussing his credibility. But the prosecutor seized this opportunity—her summation of the testimony from Thompson's most persuasive character witness—to intentionally describe Thompson as someone who "works for a man who's been convicted of robbery." Thus, the prosecutor's baseless attack on this character witness doubled as an improper attack on Thompson's character as well. Such guilt-by-association tactics have been expressly condemned by our high court. *Commonwealth v. Johnson,* 516 Pa. 527, 533 A.2d 994 (1987).

■ Our review of the record also reveals yet another passage of the prosecutor's closing which we believe was wholly improper. In addition to the several character witnesses who testified that Thompson helped out the elderly people on the block by doing odd jobs, Thompson's mother testified that on the day of the incident, Thompson had come into her home, greeted her, gotten a drink and then left. Thompson's sister, who cared for her mother, also noted Thompson's brief visit that day. The prosecutor twisted this testimony into a totally baseless attack on Thompson's character:

The defense has presented the defendant in this case as the man who takes care of all the elderly people. He takes care of strangers' mothers and fathers, and he would do all the work for them. He's just a wonderful son. Well, did you hear that from his mother? When you heard his mother testifying, you could tell from what she was saying who she counted on. She counts on her daughter. That's who takes care of her.

And what did she describe the defendant doing on August 14th when he came in the house? He came in to get some juice, said hi, and walked out. Does that sound like a dutiful son to you? I submit to you that it does not. N.T. 5/11/92 at 155. The prosecutor went so far as to call Thompson "pathetic" for dragging his mother through the ordeal of his trial. *Id.*

Thompson was on trial for allegedly killing Morris Dailey, not for the way he took care of his mother. Thompson made no claims about how he and his sister apportioned responsibility for the care of their aging mother. This utterly gratuitous character attack reminds us of Albert Camus' existentialist novel *The Stranger,* where the narrator is convicted of a murder not because of evidence that he committed the crime, but because he failed to produce a socially acceptable display of grief at his mother's funeral.

In sum, our review of the closing arguments convinces us that while many of the contested passages were permissible advocacy, two were not: using Roosevelt Cochran's criminal record to attack Edith Goodman's credibility and Thompson's character; and attacking Thompson for allowing his sister to care for their mother. In reaching this conclusion, we must emphasize that the Commonwealth did not help its case by repeatedly quoting the trial transcripts out of context in its appellate brief. While we might expect defendants to play games with the record, the prosecutor's office should not stoop to such disingenuous tactics.

### III.

We must now consider whether defense counsel can be considered ineffective for having failed to object to either of these remarks. Improper closing arguments will not often merit a new trial. It is even rarer that a defendant can meet the heavier burden of showing that trial counsel was ineffective for failing to object. Many individual hurdles must be cleared: the remarks must first be genuinely prejudicial to the defendant; this prejudice must be serious enough that it could not be cured by the court's instructions; counsel must have

had no reason for failing to object to the remarks; and finally, it must appear that objecting would have done some good—that is, counsel's failure to object denied the defendant a fair trial. *See, e.g., Commonwealth v. Baker*, 531 Pa. 541, 560, 614 A.2d 663, 673 (1992) (ineffectiveness standard); *see also Bricker*, 506 Pa. at 587, 487 A.2d at 354 (finding counsel ineffective for failing to object to prosecutor's improper closing argument).

In considering the effect of prosecutor's closing argument in the context of this trial, we must keep in mind the relative strengths of the cases. This was not a typical case where the Commonwealth presented overwhelming evidence of guilt, and the defendant merely put the Commonwealth to its proofs. On the contrary, the Commonwealth's evidence in this case was slight—a single presentation identification.

In response, Thompson put on numerous character witnesses, including neighbors who testified that he had always been a good kid who helped out the elderly. Thompson's mother and sister offered a partial alibi. Finally, Thompson took the stand himself. He acknowledged that he happened to be in the area that day on a stucco job, and that he and Charles Jones had seen each other. He simply and consistently argued that Mr. Jones must have mistaken him for the person who attacked Morris Dailey. The Commonwealth could not contradict Thompson's testimony that he was a gainfully employed, peaceable person who was in the area on legitimate business.

Closing arguments revealed what a thin case the police had handed to the district attorney's office. Naturally, the prosecutor insisted that the Commonwealth had an "extremely strong" case. N.T. 5/11/92 at 167. After so stating, the prosecutor recited all of the Commonwealth's evidence in a single paragraph: namely, Charles Jones's presentation identification of Thompson and subsequent in-court identifications. *Id.* Our review of the record leaves us with no doubt that the prosecutor tried to cover a weak case with strong rhetoric. She deliberately sought to diminish the impact of Thompson's best character witness by supplying answers to unasked ques-

tions, and she tried to impugn Thompson's character with associational guilt and irrelevant criticism of how he cared for his mother.

Thompson presents a meritorious claim. His counsel should have raised some objection to these two lines of grossly improper argument. "A prosecutor must be free to present his arguments with logical force and vigor. But, while he may strike hard blows, he is not at liberty to strike foul ones." *Commonwealth v. Green,* 417 Pa.Super. 119, 127, 611 A.2d 1294, 1298 (1992) (quoting *Commonwealth v. Cherry,* 474 Pa. 295, 301–03, 378 A.2d 800, 803–04 (1977); other citations omitted). As our review of the record documents, the prosecutor got in at least two foul blows; Thompson's counsel should have complained to the judge, who refereed the bout.

Nor can we posit any tactical reason for counsel's decision to let the improper attacks go by. The defense presented a solid, consistent case of misidentification. The defense did not try to downplay the brutal nature of the crime, or argue that Thompson was a perfect human being. Counsel could have objected to the prosecutor's improper commentary on Edith Goodman's testimony and unwarranted attacks on Thompson's character without fear, because all of these matters were irrelevant to the question of mistaken identification. Furthermore, we think that the offending remarks were of sufficient potency to have affected the outcome of the trial. Where the evidence of guilt is far from overwhelming, we should be especially hesitant to brush off a starkly improper closing speech as harmless. *Green, supra* at 128, 611 A.2d at 1299; *see also Bricker, supra,* 506 Pa. 571, 487 A.2d 346.

Thus, our review leads to the conclusion that the prosecutor made two inflammatory and improper remarks in her closing speech, and that counsel was ineffective for failing to object. We believe that the prejudicial effect of these remarks was cured, however, when the trial court carefully instructed the jury that counsel's closing arguments were not evidence. N.T. 5/11/92 at 195. The jury is presumed to have followed this instruction. *Commonwealth v. Baker,* 531 Pa. 541, 558, 614 A.2d 663, 672 (1992). "Only where the unavoidable effect of

the remark creates such a bias and hostility that the jury could not render a true verdict will reversal be mandated." *Id.* (citing *Commonwealth v. Stoltzfus*, 462 Pa. 43, 61, 337 A.2d 873, 882 (1975)). We do not think that this high threshold has been met. While the prosecutor may have struck some foul blows, they were not incurably foul. We therefore affirm the judgment of sentence.

Affirmed.

JOHNSON, J., concurs in the result.