**Commonwealth v. Hicks**

240

*James Lavelle, assistant district attorney,* for Commonwealth.

*Paul Levy*, for defendant.

NANOVIC, *P.J.*, March 9, 2011—On June 11, 2010, the defendant, Tracey Hicks, was convicted of robbery, receiving stolen property, and conspiracy to receive stolen property.[1] In her post-sentence motion, now before us, defendant seeks a new trial premised on prosecutorial misconduct: the prosecutor's expression of personal beliefs and opinions during closing arguments concerning the testimony and evidence presented. Following our review of the record, we deny defendant's motion.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 16, 2008, defendant drove her husband, Jack Ensel, to a small strip mall in Nesquehoning, Carbon County, Pennsylvania. At the western end of the mall is a

---

1. 18 Pa.C.S.A. §§ 3701 (a) (1) (iv), 3925 (a) and 903, respectively. Defendant was acquitted on the charge of conspiracy to commit robbery (threat or fear of imminent bodily injury). 18 Pa.C.S.A. § 903.

CVS pharmacy. In order, proceeding eastward from the pharmacy, is a campus of the Lehigh Carbon Community College, a Chinese restaurant and an auto parts store. All four businesses share a common parking lot at the front of the mall.

Defendant arrived at the mall, with Ensel, shortly after 4:00 p.m., in broad daylight. Defendant parked her vehicle in the parking lot near the front of the Community College. The temperature was warm, approximately 75 degrees. Ensel exited the vehicle wearing a hooded flannel jacket with the hood pulled up, and headed toward the pharmacy. As he entered the pharmacy, Ensel pulled the hood further forward and masked his face with a bandanna, such that only his eyes were visible.

Ensel walked directly to the pharmacy counter near the rear of the store, stepped beyond a swinging gate which separated the pharmacy proper from the rest of the store and, with one hand in his pocket intimating he possessed a weapon, stated "give me the Oxycontin and no one will get hurt." In response, the pharmacist on duty unlocked the narcotics safe, pulled out a tray filled with Oxycontin and Oxycodone bottles, and handed it to Ensel. The tray was white in color, approximately a foot and a half by a foot in size, and contained 26 bottles of Oxycontin and Oxycodone. The retail value of this medication was $11,982.50.

Upon receipt of this tray, Ensel returned to the front entrance and exited the pharmacy with his head and face still concealed by the hood and mask. (N.T., 6/10/10, p.32) As he exited the pharmacy, he walked west, in the

opposite direction from which he had originally entered the pharmacy. Defendant, who was waiting in her vehicle watching for Ensel to exit, immediately drove in his direction, stopping several feet in front of where he was walking. Ensel first placed the tray with the Oxycontin and Oxycodone onto the rear passenger seat and then climbed into the back seat himself. As this was occurring, the store manager recorded the license plate number of defendant's vehicle. This, together with the make and model of the vehicle, was directly reported to the 911 communications center.

Defendant and Ensel were apprehended by the police approximately five to 10 minutes later as they pulled up to their home in Lansford, Carbon County, Pennsylvania. At the time of their apprehension, defendant was in the driver's seat and Ensel was in the rear passenger seat. The tray taken from the pharmacy was on the seat beside Ensel, however, some of the pill bottles were observed to be on the car seat and some on the rear floor. (N.T., 6/10/10, pp. 81-82) Also on the seat beside Ensel was his hooded jacket. A subsequent search of the vehicle located two bandannas on the rear floor behind the driver's seat and an empty bottle of Oxycodone HCL in the front passenger seat with Ensel's name on it. (N.T., 6/10/10, p. 164)

After their arrest, on the same day, both defendant and Ensel were taken to the Nesquehoning police station where they were separately questioned, after being Mirandized by officer Wuttke of the Nesquehoning Police Department. Officer Wuttke first questioned Ensel. After next questioning defendant, he again questioned Ensel

and then defendant again. A period of approximately 40 to 45 minutes separated Officer Wuttke's first and second questioning of defendant.

When first questioned by Officer Wuttke about the events of that day, defendant stated that she awoke at approximately 2:30 p.m. when her daughter came home from school; that she went outside for a cigarette; that while outside she spoke with her husband who asked if she would go with him to the store; that at the store her husband asked her to wait outside in the parking lot and to pull up and pick him up when he exited; that this was often the case when she accompanied her husband to the store and that the manner in which she picked her husband up on this occasion was not out of the ordinary; that she wasn't sure what her husband was carrying when he left the store; that it was something white, like a bag; that her husband got in the back seat, which he normally does; that she was then medicating with Oxycodone 30 but was being weaned from it and was experiencing withdrawal sickness; and that she believed her husband had taken the Oxycontin and Oxycodone because he was depressed over their financial circumstances because they had recently lost their home to foreclosure. Defendant denied that she knew her husband intended to rob the pharmacy at the time he went inside.

During the second interview with defendant on October 16, 2008, defendant told Officer Wuttke that her husband woke her up before they left for the store; that before leaving, her husband told her he was going to hit a pharmacy but that she believed this was idle talk and,

after speaking with her husband, that he had no intent of following through; that her husband did not ask her to accompany him to the pharmacy; and that later, when they were at the pharmacy and she was waiting for her husband to return, she did not find it peculiar that the same day her husband said he intended to hit a pharmacy, they were at a pharmacy and she was waiting to pick him up as soon as he exited.

At trial, defendant testified that she first woke up at 5:30 a.m. on October 16, 2008, to get her children ready for school; that sometime between 5:30 a.m. and 7:00 a.m. her husband mentioned he planned to hit a pharmacy, but she spoke against it and thought that was the end of it; that she went back to bed; that she again woke up about 2:30 in the afternoon, and went outside for a cigarette; that her husband was not the one to wake her; that while outside her husband asked if she would go to the store with him for gas and cigarettes; that they drove to a gas station in Nesquehoning, rather than in Lansford, because the gas and cigarettes were cheaper there; that they were able to get gas but not cigarettes because the station was sold out of the brand of cigarettes they smoked; that while there she asked if they could go to the Chinese restaurant in town; that they did this, but once there she remembered she didn't like the way this restaurant prepared what she intended to order; that they did not enter the restaurant; that before leaving her husband decided to enter the pharmacy to get cigarettes and told her to wait for him; that she did so and when she saw him leaving the pharmacy she drove over to pick him up; that when he exited the store, his face was not covered and his hood was not up; that she

thought he was carrying a white bag; that he got in the back seat because the hinge for the front passenger door had broken off; that she never saw the tray or bottles of Oxycontin and Oxycodone after her husband entered the car and before they were stopped by the police; that her husband mentioned nothing about robbing the pharmacy as they drove home; that both she and her husband were using Oxycodone at the time but she was being weaned off of it; and that she first learned of the robbery when she and her husband were confronted by the police in front of their home.

In closing arguments, the assistant district attorney frequently used the first person in discussing the evidence and characterized parts of defendant's testimony as being ridiculous, being incredible, and being a lie. Specifically, defendant takes issue with the following nine statements made by the assistant district attorney:

"One of the versions to you or Officer Wuttke was a lie. That is the only conclusion you can draw." (N.T., 6/11/2010, p. 41)

"I think it is a ridiculous explanation. I don't think that is any way that people normally act when they are going to the store with their spouse. I think inescapably what it points to is that she knew that he was going to be coming out of that store with Oxycontin. She was hoping he would do it. She was ready and there to assist him when he came out. Again that is proof of the agreement. That is the only logical explanation." (N.T., 6/11/2010, p. 47)

"There's no explanation for that. You cannot reconcile those two things." (N.T., 6/11/2010, p. 50)

"I don't think it is an amazing coincidence. I think it is part of her motive. I think she was addicted to Oxycontin. I think she was addicted to Oxycontin. I think she wanted to acquire some." (N.T., 6/11/2010, p. 55)

"I know she testified she didn't know the pills were there. But come on, how likely is that to be true?... It is a ridiculous notion." (N.T., 6/11/2010, p. 58)

"How reasonable is it to believe that? It is not reasonable at all. I was struck yesterday at the racket these things make as well. I am not going to belabor it. They are in their evidence bags. But I can't believe in a traveling car that you wouldn't hear them a little bit, or a lot.... It is incredible to me that she would be able to remain ignorant." (N.T., 6/11/2010, p.59)

"She was aware of them. She is lying to you when she said she wasn't. Just like she is fooling around with the story that she gave to Officer Wuttke. She is changing her story. You cannot trust her. You cannot believe her. Look at her as a witness. She has incentive to lie to you." (N.T., 6/11/2010, p. 59)

"She, again, stands to benefit if you believe her lies." (N.T., 6/11/2010, p. 60)

"I think the story itself, just standing on its own, is a ridiculous one.... that story is not something I believe. I would encourage you to disbelieve it as well, just on its

face." (N.T., 6/11/2010, p. 60)

At the close of the commonwealth's argument, defense counsel objected to the assistant district attorney characterizing the defendant as a liar and asked for a mistrial.[2] (N.T., 6/11/2010, p.39) In denying this request, the following exchange occurred at sidebar:

THE COURT: I am not aware of any case that I have read that says that the Commonwealth using the term liar to describe a witness's testimony is inappropriate. Obviously, it is very strong language, but I am not sure if it is legally inappropriate and would justify a mistrial. So, I am going to deny the request.

I will be instructing the jury that they have to make

---

2. Strictly speaking, defendant's objection at trial and in her post-sentence motion is limited to being called a liar. Not until defendant filed a brief in support of her post-sentence motion did defendant question the propriety of the other comments previously quoted in the text. Consequently, while we believe these other grounds for a mistrial have been waived, we have elected nevertheless to review their merits. *Commonwealth v. Mollett*, 5 A.3d 291, 313 (Pa.Super. 2010) (finding waiver on failure to object to particular statement made in closing argument).

We also note that the basis of defendant's grounds for a mistrial was not waived by defendant waiting until the close of the Commonwealth's argument before making her objection. On this point, the Pennsylvania superior court in *Commonwealth v. Judy* stated:

We note that issues relating to the objection and request for mistrial on the ground of prosecutorial misconduct are properly preserved notwithstanding the fact that counsel waited until the end of the assistant district attorney's closing to lodge the objection and move for a mistrial. *Commonwealth v. Rose*, 960 A.2d 149, 154-155 (Pa. Super.2008). While the lack of a request for a contemporaneous curative instruction constitutes a waiver of any claim of error based upon the failure to give such curative instruction, the objection coupled with the request for the remedy of a mistrial preserves denial of the mistrial for appellate review. *Commonwealth v. Robinson*, 543 Pa. 190, 670 A.2d 616, 622 n. 9 (1995). 978 A.2d 1015, 1018 (Pa. Super. 2009).

their own determination of the facts and they have to determine whether a person is truthful or not truthful. It is not counsel's determination, but it is their determination.

MR. LEVY: Understood.

THE COURT: So, I will make sure they are aware of that.

MR. LEVY: Judge, for the record, I understand that. I assume that would have been in your instructions. I just feel under the circumstances, it is a cautionary instruction that may not be — regardless of how many times you emphasize it — may not be sufficient. It may wind up doing the reverse, because it winds up almost emphasizing it. So, I am not asking you to point out he referred to her as a liar.

THE COURT: Quite honestly, generically, within my credibility instructions, that's implicit in them. If you want me to specifically refer to the fact that counsel at times used strong language but ultimately they have to determine what the facts are, I can certainly do that.

MR. LEVY: Judge, if you can use what you just indicated, that counsel at times used strong language, that would cover it.

THE COURT: Okay. I will do so.

MR. LEVY: But again, because you are doing that, I am still not removing my objection.

THE COURT: I realize you are not waiving your

objection.

MR. LEVY: Thank you. That is what I was looking for.

THE COURT: Thank you.

MR. LAVELLE: Thank you. (N.T., 6/10/2010, pp. 39-41).

In our general charge to the jury, we instructed the jury that the jurors are the sole judges of the facts and the credibility of the witnesses; and that the closing statements of counsel are not evidence, but that such arguments may be considered as a factor in deliberations. In addition, we stated the following:

Now, I also want to say that counsel in speaking to you at times can use extremely strong language. Counsel made[3] comment on the testimony of witnesses and whether or not it should be believed or disbelieved. But I caution you, regardless of counsel's opinions, regardless of how counsel described the testimony of witnesses and the credibility, it is you, and you alone, who make that decision as to which witnesses should be believed and which witnesses should not be believed. You, and you alone, make the decision as to what testimony you heard is the accurate testimony and what testimony is not accurate. It is not up to counsel to make that decision for you. You should consider,

---

3. In the original transcript of the proceedings this word appeared as "may" rather than "made." In the preparation of this opinion, this portion of the transcript, as well as the tape of the trial, was reviewed with the stenographer, and corrected to reflect the actual word used.

again, counsels' positions in what they argue to you. You alone make the determinations of who to believe and not to believe. (N.T., 6/11/2010, pp. 83-84).

At the conclusion of our charge, on specific inquiry by the court, neither counsel had any further comment on this issue or the court's cautionary instructions. (N.T., 6/11/2010, p. 87)

## DISCUSSION

As a general rule,

a prosecutor is free to argue the reasonable inferences supported by the record. A prosecutor may not, however, interject his personal opinion regarding the credibility of any witness, including the accused, nor may he argue facts which may be within his personal knowledge but which are not of record. Although the prosecutor may not assert his personal belief as to the guilt or innocence of the accused, the prosecutor may argue that the evidence proves the defendant guilty as charged. *Commonwealth v. Gunderman*, 407 A.2d 870, 873 (Pa.Super. 1979). (internal citations omitted).

Consequently, while "a prosecutor must limit his statements to the facts introduced at trial and the legitimate inferences therefrom, and may not inject his personal opinion of a defendant's credibility into evidence," he "is free to argue that the evidence leads to guilt, and is permitted to suggest all favorable and reasonable inferences that arise from the evidence." *Commonwealth v. Stafford*, 749 A.2d 489, 499 (Pa. Super. 2000) (citations and quotation marks omitted). "[P]rosecutorial misconduct will not be

found where comments were based on the evidence or proper inferences therefrom or were only oratorical flair." *Commonwealth v. Judy*, 978 A.2d 1015, 1020 (Pa. Super. 2009) (citation and quotation marks omitted).

"[A] prosecutor has considerable latitude during closing arguments and his arguments are fair if they are supported by the evidence or use inferences that can reasonably be derived from the evidence." *Judy*, 978 A.2d at 1020 (citation and quotation marks omitted). Further,

> [i]n determining whether the prosecutor engaged in misconduct, we must keep in mind that comments made by a prosecutor must be examined within the context of defense counsel's conduct. It is well settled that the prosecutor may fairly respond to points made in the defense closing.... If defense counsel has attacked the credibility of witnesses in closing, the prosecutor may present argument addressing the witnesses' credibility. *Id.*

> In reviewing prosecutorial remarks to determine their prejudicial quality, comments cannot be viewed in isolation but, rather, must be considered in the context in which they were made. Generally, comments by the district attorney do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict. *Commonwealth v. Sampson*, 900 A.2d 887, 890 (Pa.Super. 2006) (citation and quotation marks omitted), appeal denied, 907 A.2d 1102 (Pa. 2006).

"Prosecutorial misconduct is evaluated under a harmless error standard." *Judy*, 978 A.2d at 1020 (citation and quotation marks omitted).[4] Ultimately, "an allegation of prosecutorial misconduct requires us to evaluate whether a defendant received a fair trial, not a perfect trial." *Id.* at 1019.

In examining the statements made by the assistant district attorney which the defendant questions, we must distinguish between those statements which permissibly comment on the evidence, albeit in the first person, and those which impermissibly communicate the prosecuting attorney's personal opinion of defendant's credibility. This latter bar does not prohibit the prosecutor from questioning the credibility of a witness provided his comments are tied to the evidence. *Judy*, 978 A.2d at 1020. (citation omitted) Moreover, "[i]f defense counsel has attacked the credibility of witnesses in closing, the prosecutor may present argument addressing the witnesses' credibility." *Id.* (citation and quotation marks omitted)

The prosecuting attorney is entitled to argue issues of credibility and in doing so may "urge the jury to make a fair inference from the facts adduced at trial." *Stafford*, 749 A.2d at 499. (citation and quotation marks

---

4. Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was de minimis; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. *Commonwealth v. Chmiel*, 585 Pa. 547, 581, 889 A.2d 501, 521 (Pa. 2005) (citation and quotation marks omitted). "The burden of establishing that the error was harmless rests upon the Commonwealth." *Id.* at 594, 889 A.2d at 528.

omitted) The Commonwealth is not prohibited from arguing inconsistencies in the evidence, improbabilities, or implausible explanations. Nor is the Commonwealth prohibited from questioning the defendant's motives or incentive to lie when on the witness stand. The fact that the Commonwealth uses the first person in making such arguments does not undermine their propriety or validity if grounded in the evidence rather than as an expression of counsel's personal belief or opinion as to the truth or falsity of such testimony. *See Gunderman*, 407 A.2d at 873 ("Though the prosecutor used the first person [i.e., 'I think'] in this part of his argument, the inferences he was urging were to be based strictly upon the evidence.").

On the other hand, "a prosecutor cannot intrude upon the exclusive function of the jury to evaluate the credibility of witnesses by broadly [and indiscriminately] characterizing the testimony of a witness as a 'big lie'"). *Judy*, 978 A.2d at 1023 (citation and quotation marks omitted); *Commonwealth v. Kuebler*, 399 A.2d 116, 119 (Pa. 1979); *see also Commonwealth v. Cherry*, 378 A.2d 800, 804 (Pa. 1977) (stating that improper statements by a prosecutor during argument are of special concern because of the effect such statements may have on the jury due to the prestige associated with his position and because of the assumed fact-finding facilities available to a prosecutor). However, "a prosecutor's assertion that a witness had lied does not warrant a new trial when the statement was a fair inference from irrefutable evidence rather than a broad characterization." *Judy*, 978 A.2d at 1023-24. (citation and quotation marks omitted); *see also Commonwealth v. Johnson*, 588 A.2d 1303, 1305 (Pa. 1991) (holding that a

prosecutor's comments stating that a defendant had lied were neither unfair nor prejudicial when given in response to the comments of defense counsel in relation to the credibility of witnesses, and when they were supported by the evidence). Further, "[a] prosecutor's contention that a defendant lied is neither unfair nor prejudicial when the outcome of the case is controlled by credibility, the accounts of the victim and the defendant conflict, and defense counsel suggests that the victim is fabricating." *Judy*, 978 A.2d at 1024.

In all but one instance, we find the prosecutor's comments to be arguments based on the evidence and not on his personal opinion. The first statement was directed at the inconsistencies in the two statements defendant gave Officer Wuttke following her arrest and those made at trial regarding when she got up on October 16, 2008 and who got her up. The next statement evaluated the likelihood that the reason defendant pulled up when her husband left the pharmacy was because this is what she always does in contrast to the inference that such conduct indicated she knew what her husband was doing in the pharmacy and she was there to pick him up to assist in his getaway. The third comment concerns the implausibility of defendant waiting and watching for her husband to leave the pharmacy, being able to clearly identify him when he did so, and yet not noticing that he was carrying a tray one and a half by one foot in size filled with bottles of medication.

In the fourth comment, the assistant district attorney noted that it was not mere coincidence that defendant was taking Oxycodone herself, and being weaned from it at the

time of the robbery, that her addiction supplied a motive for her to assist her husband in obtaining Oxycontin from the pharmacy. The next two comments are in reference to defendant's disclaimer that she was unaware that her husband was carrying a tray full of medication when he entered her car. During trial, when the assistant district attorney picked up and carried the medication it rattled. Given this noise, the number of bottles, and the shape and size of the tray, the assistant district attorney legitimately questioned how defendant could not know what her husband had taken from the pharmacy. In this same context, the assistant district attorney in his seventh comment claimed, in effect, that defendant must be either deaf, dumb and blind or must be lying when she denied being aware of the pills before reaching Lansford, an inference supported by the record. In addition, in the seventh and eighth comments, the assistant district attorney appropriately commented on why defendant would change her stories and deny any knowledge of what her husband had done: she had a motive to lie, to save herself. Such comments were not intended to inflame, distract or mislead the jury.

The ninth and final comment which the defendant questions is the assistant district attorney's characterization of defendant's explanation for being at the shopping mall — that she was there to get Chinese food which she later decided not to get because, once there, she realized she did not like their food, rather than that she was there to help her husband escape — as ridiculous and a story which he did not believe. The characterization of defendant's story as ridiculous was fair comment given the contradiction inherent in defendant's desire to get Chinese food from

a restaurant whose food she did not like, an explanation not previously disclosed to Officer Wuttke on October 16, 2008, when she was asked why she and her husband were at this pharmacy on the same day her husband had threatened to hit a pharmacy. Cf. *Gunderman*, 407 A.2d at 873 (holding that a prosecutor's comment that "I think you should find [defense witnesses' story] absolutely incredible" did no more than argue an inference based upon the evidence before the jury). This comment was also in response to defense counsel's argument that if defendant was lying, "I am sure" she could have come up with a better lie. (N.T., 6/11/10, pp. 37-38) At most, this was oratorical flair.

However, the final aspect of this comment, that the assistant district attorney did not believe her story and encouraged the jury to likewise disbelieve her, overreached the bounds of permissible argument. In this comment, the assistant district attorney was clearly expressing his personal opinion of the believability of defendant's story, not simply arguing inconsistencies and implausibilities. While we cannot condone this statement, neither do we find it "... so persuasive or deliberate so that the unavoidable effect thereof was to prejudice the jury to the point that they could not fairly weigh the evidence." *Sampson*, 900 A.2d at 891 (citation and quotation marks omitted).

In acting on a request for mistrial, we "must discern whether misconduct or prejudicial error actually occurred, and if so,... assess the degree of any resulting prejudice." *Judy*, 978 A.2d at 1019.

Not all inappropriate comments by the Commonwealth

merit a new trial. "[C]omments by a prosecutor do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds a fixed bias and a hostility toward the defendant such that they could not weigh the evidence objectively and render a true verdict." *Commonwealth v. Speight*, 544 Pa. 451, 677 A.2d 317, 324 (1996). Even if the prosecutor makes improper remarks, the action to be taken is within the discretion of the trial court because it has the opportunity to see the atmosphere and context in which the comments were made. *See Commonwealth v. Silvis*, 445 Pa. 235, 284 A.2d 740, 741 (1971). *Stafford*, 749 A.2d at 498 (Pa.Super. 2000).[5]

In denying defendant's motion for a mistrial we note first that the assistant district attorney's personal opinion of defendant's credibility was immediately juxtaposed with his comment that defendant's story was ridiculous, a permissible inference. Moreover, in the same breath, the assistant district attorney urged the jury to exercise its independent judgment in assessing the explanation defendant offered for being at the pharmacy, and to disbelieve it. Second, the assistant district attorney was responding, at least in part, to defense counsel himself having personally, and impermissibly, vouched for the

---

5. This follows from the standard of review for the denial of a motion for mistrial: "A motion for a mistrial is addressed to the discretion of the court. It is primarily within the trial court's discretion to determine whether defendant was prejudiced by the misconduct. On appeal, [the appellate court's] standard of review is whether the trial court abused that discretion." *Commonwealth v. Stafford*, 749 A.2d 489, 500 (Pa. Super. 2000) (citation and quotation marks omitted).

defendant's credibility.[1] Finally, we do not find the assistant district attorney's remarks to have been so intrusive of the jury's exclusive function of evaluating the credibility of witnesses and so inflammatory as to be incapable of being cured by our cautionary instructions. When the prosecution's remarks are viewed in the context of the argument then being made and our instructions to the jury concerning the opinions of counsel and who determines credibility, the assistant district attorney's words were not so prejudicial that the jury became incapable of exercising its independent judgment and rendering a true verdict. *See also Commonwealth v. Chmiel*, 585 Pa. 547, 603, 617-21, 889 A.2d at 501, 534, 543-45 (Pa. 2005) (finding prosecutor's comments to be permissible when defense counsel repeatedly called the prosecution's witnesses liars and had vouched for the credibility of the defense's witnesses; also noting the presumption that juries follow instructions given by the trial court).

## CONCLUSION

Legally and substantively a distinction exists between a prosecutor who tells the jury what he thinks about a witness's testimony and one who tells the jury what he thinks the evidence shows. The first is prohibited by law as usurping the function of the jury. The second, while often frowned upon and sometimes misleading, is allowed provided the distinction between personal opinion and

---

1. This occurred twice during defense counsel's closing arguments: first when counsel corroborated defendant's testimony that gas prices are cheaper in Nesquehoning than in Lansford, thus supporting defendant's reason for being in Nesquehoning, and next when counsel stated that defendant's testimony was the truth. (N.T., 6/11/10, pp. 32, 38)

arguing the evidence is maintained.

In the case at bar, while the assistant district attorney frequently couched his closing arguments in the first person, the context in which these comments were given, together with the evidence used to support them, demonstrates the assistant district attorney's intent not to divert the jury from the evidence, but instead to urge the jury to make credibility determinations based upon the evidence. In doing so, the assistant district attorney argued not that the jury should disbelieve the defendant because he disbelieved her; rather, he argued that defendant should be disbelieved because the evidence supported this inference. This is within the bounds of proper argument.

In one instance, however, we find the assistant district attorney exceeded what is allowable. In arguing that defendant's explanation for being at the pharmacy is a story he did not believe, the assistant district attorney went beyond the evidence to a pure statement of personal belief. While improper, we have concluded that the context in which this belief was expressed, tempered by our cautionary instructions, prevented this isolated comment from uncorrectably prejudicing the jury against defendant, causing the jury to abandon its responsibility to weigh the evidence objectively and to be unable to arrive at a true verdict. Ultimately, we do not find that defendant was unfairly prejudiced by the assistant district attorney's comments or that defendant was denied a fair trial.