IN THE SUPREME COURT OF PENNSYLVANIA
WESTERN DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 42 WAP 2017 |
| | : | |
| Appellee | : | Appeal from the Order of the Superior |
| | : | Court entered on February 22, 2017, |
| | : | at No. 1037 WDA 2016 affirming the |
| v. | : | Order of the Court of Common Pleas |
| | : | of Beaver County entered June 16, |
| | : | 2016 at No. CP-04-CR-0001902- |
| JAVONN ERIC CLANCY, | : | 2012. |
| | : | |
| Appellant | : | SUBMITTED:  March 5, 2018 |

**OPINION**

**JUSTICE WECHT**                    **DECIDED:  AUGUST 21, 2018**

In this discretionary appeal, Javonn Eric Clancy challenges the dismissal of the petition he filed under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-46. In that petition, Clancy alleged that his trial counsel was ineffective for failing to object to purportedly inflammatory statements made by the prosecutor during closing arguments. Specifically, the prosecutor characterized Clancy as a "dangerous man" and a "cold blooded killer." We hold that, within the context of the instant case, the prosecutor's statements constituted permissible oratorical flair. Accordingly, we conclude that Clancy's claim of ineffectiveness of counsel lacks arguable merit. We affirm the order of the Superior Court.

On July 30, 2012, Clancy was on the 300 block of Linmar Terrace in Aliquippa, Beaver County, talking with several individuals, including Dyquane Norman. Marquay Lavar Rigins approached Norman to discuss a past robbery. Clancy inserted himself

between the two men, insulted Rigins, and punched Rigins in the face. Rigins responded by knocking Clancy to the ground and hitting him. The men grappled on the ground for a few moments until Norman intervened. Once Clancy and Rigins were separated, Clancy drew a handgun and fired multiple shots at Rigins. As Rigins attempted to flee, Clancy shot him three times in the back. One bullet pierced Rigins' aorta, ultimately causing his death.

Clancy dropped the gun and fled Linmar Terrace. He ran into a nearby wooded area and emerged into a yard on Green Street. Susan Ours, the owner of the property, asked Clancy whether he needed help. When Ours informed Clancy that he was on private property, Clancy apologized and began walking down Green Street. Clancy then stopped at a convenience store, purchased a bottle of water, and went to a friend's house to charge his cell phone. Soon after, Clancy fled to Pittsburgh, in adjoining Allegheny County. Clancy evaded authorities until he turned himself in on September 4, 2012.

The Commonwealth charged Clancy with criminal homicide, 18 Pa.C.S. § 2501, and carrying a firearm without a license, 18 Pa.C.S. § 6106(a)(1). At trial, Clancy argued to the jury that his actions did not amount to first-degree murder because he had been moved by passion as a result of the fight with Rigins. Clancy testified that, "my anger took over me . . . I just pulled the gun out . . . I heard one bang, and then after that I just heard the click." Notes of Testimony ("N.T."), Trial Vol. III, 4/11/2013, at 125. Clancy further testified that he neither aimed the gun at Rigins nor intended to shoot him.

The Commonwealth presented several witnesses, including Norman, who testified that Clancy verbally engaged and struck Rigins first with little provocation, and that Clancy fired multiple shots directly at Rigins as the latter fled. The prosecutor displayed and asked questions about a twelve-second surveillance video that partially depicted the events at issue. Although the fight and the shooting occurred outside of the camera's

frame, the video appeared to show Clancy's hand pulling something out of his pants before bystanders in the area began to run away. The video also depicted one bystander running alongside Rigins as he fled.

During his closing argument, the prosecutor disputed Clancy's claim that he indiscriminately shot his gun in anger, pointing out that Clancy shot Rigins three times in the back without hitting any of the bystanders. The prosecutor further argued:

> [T]he fact that residents of Linmar, given how the snitch[-]free mentality runs rampant . . . the fact that they came forward speaks volumes, because even in their eyes, this was a cowardly act of murder.
>
> \*     \*     \*
>
> [Clancy is] trying to win points with you. [His testimony] was so insincere, and if you have had an opportunity to watch him throughout this trial, he doesn't sit over here on an island. . . . Cold, collected, no emotion from him. He's a killer, a killer.
>
> \*     \*     \*
>
> He's so cool and collected, he stops at a store and gets water after having just emptied his firearm, three shots in the back of an unarmed man. Not only does he drink water. He starts making phone calls. . . . He goes to a friend's house, a girl. He gives us her name, and he remembers charging his phone, calm, cool, collected . . . .
>
> \*     \*     \*
>
> This was a cowardly killing even by Linmar standards.
>
> \*     \*     \*
>
> He is the lone shooter. He did a cowardly killing. He did a first[-]degree murder.
>
> \*     \*     \*
>
> That's a dangerous man. That is a cold blooded killer.

N.T., Trial Vol. IV, 4/12/2013, at 35, 37, 42, 45, 47-48. Clancy's trial counsel, Steven Valsamidis, raised no objections.

The jury found Clancy guilty of first-degree murder, 18 Pa.C.S. § 2502(a), and carrying a firearm without a license, 18 Pa.C.S. § 6106(a)(1). On May 29, 2013, the trial court sentenced Clancy to life imprisonment without the possibility of parole for first-degree murder. The trial court also sentenced Clancy to a concurrent term of two to seven years' imprisonment for carrying a firearm without a license. Clancy filed post-sentence motions challenging the weight and sufficiency of the evidence, which motions the trial court denied on August 28, 2013.

On August 29, 2014, the Superior Court affirmed Clancy's judgment of sentence. *See Commonwealth v. Clancy*, 1594 WDA 2013, 2014 WL 10803153 (Pa. Super. Aug. 29, 2014). On March 9, 2015, this Court denied Clancy's petition for allowance of appeal. *See Commonwealth v. Clancy*, 112 A.3d 649 (Pa. 2015) (*per curiam*).

On August 13, 2015, Clancy timely filed a *pro se* PCRA petition. The PCRA court appointed counsel, who, on November 17, 2015, filed an amended PCRA petition. Therein, Clancy argued, *inter alia*, that his prior counsel was ineffective for failing to object to the above-quoted portions of the prosecutor's closing argument. Clancy asserted that the prosecutor's statements amounted to an impermissible expression of personal belief, that they disparaged a defense "strategy," and that they inflamed the jury.

At a February 26, 2016 evidentiary hearing, Clancy's PCRA counsel called Attorney Valsamidis to testify. Attorney Valsamidis testified that he did not believe that the prosecutor's closing argument was objectionable, and that he believed that the prosecutor's argument would be perceived negatively by the jury. N.T., PCRA Hearing, 2/26/2016, at 56-57. With regard to the "cold blooded killer" remark, Attorney Valsamidis explained:

> Given the testimony that had come in, that was the theory of the case that Javonn Clancy had killed Mr. Riggins [*sic*]. It's closing argument. There's a certain amount of argument permissible. It did catch my attention because I was wondering if he was going to elaborate on it. If he would

have said something to the effect of, "He needs to be punished," he couldn't say that without putting his own opinion into it.

If he would have said, referencing the safety of the jurors at home, the community, something along those lines in conjunction with that statement, that would be playing upon emotion or putting his own opinion in it. But just simply stating that he's a killer, that's the theory of their case. He was permitted to argue it.

\* \* \*

The other reason I didn't object is . . . I thought during his closing argument he came across as combative or dislikable [*sic*] and almost desperate at times, because the, some of the things that you just referenced weren't supported by the facts, and I felt that he was hanging onto calling him names, referencing how he's a killer.

*Id.* Attorney Valsamidis further testified that he thought the "dangerous man" remark was permissible argument:

I perceived it as the case. His theory was that he shot somebody, and that's dangerous. I didn't take that as him playing upon the emotion of the jurors.

*Id.* at 59. The PCRA court denied Clancy's PCRA petition. On July 15, 2016, Clancy filed a timely notice of appeal. On August 5, 2016, Clancy complied with the PCRA court's order to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).[1]

---

[1]    Relevant to the appeal before us today, Clancy raised the following issues in his Pa.R.A.P. 1925(b) statement:

1.  Did the PCRA Court commit an error by concluding that the Assistant District Attorney did not merely label the defendant as a murderer and in further finding that his statements regarding the defendant as being a cold blooded killer were not the actions of the prosecutor in advocating his personal belief of the defendant's guilt and was counsel therefore ineffective for failing to object to such testimony?

2.  Whether the PCRA court committed an error in dismissing the case of *Commonwealth v. Capalla*, 185 A. 203 (Pa. 1936)[,] as being inapplicable to this case and, as having been modified "sub silentio"?

\* \* \*

In its Pa.R.A.P. 1925(a) opinion, the PCRA court first noted that, to be eligible for relief under the PCRA, Clancy had to plead and prove, by a preponderance of the evidence, that the ineffectiveness of his trial counsel "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." PCRA Ct. Op. at 5 (citing 42 Pa.C.S. § 9543(a)(2)). After setting forth the elements of an ineffective assistance of counsel claim,[2] the PCRA court explained that courts must consider a prosecutor's statements in the context of the evidence and the reasonable inferences drawn fairly from that evidence. *Id.* at 7 (citing *Commonwealth v. Chamberlain*, 30 A.3d 381, 408 (Pa. 2011) (holding that a prosecutor could argue that the

---

6. Was trial counsel ineffective by failing to object to the conduct of the prosecutor who, during closing arguments, opening statements[,] and other portions of the trial made objectionable statements and elicited evidence which constituted improper statements and/or statements of personal beliefs on behalf of the prosecutor?

Concise Statement, 8/5/2016 (citation modified).

[2] The PCRA court explained that:

[W]e apply a three-pronged test for determining whether trial counsel was ineffective, derived from our application in *Commonwealth v. Pierce*, 527 A.2d 973, 975 (1987), of the performance and prejudice test articulated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). The *Pierce* test requires a PCRA petitioner to prove: (1) the underlying legal claim was of arguable merit; (2) counsel had no reasonable strategic basis for his action or inaction; and (3) the petitioner was prejudiced—that is, but for counsel's deficient stewardship, there is a reasonable likelihood the outcome of the proceedings would have been different. *Pierce*, 527 A.2d at 975. If a petitioner fails to prove any of these prongs, his claim fails. Moreover, counsel is presumed to be effective, and a petitioner must overcome that presumption to prove the three *Strickland/Pierce* factors.

PCRA Ct. Op. at 5-6 (quoting *Commonwealth v. Simpson*, 66 A.3d 253, 260 (Pa. 2013)) (citations modified).

defendant was a "murderer" because inferences from the evidence led to the conclusion that the defendant murdered the victim in the case)).

Turning to the statements that Clancy challenged,[3] the PCRA court concluded that that the characterization of the killing as "cowardly" was "based upon the evidence that [Clancy] shot [Rigins] as he fled across the street and that [Clancy] should therefore be found guilty of first[-]degree murder and not merely voluntary manslaughter." *Id.* at 11. The court determined that the prosecutor was permitted to call Clancy a "killer" upon that same basis, and that, in so doing, the prosecutor was not advocating his personal belief about Clancy's guilt. *Id.* (quoting *Chamberlain*, 30 A.3d at 408, and noting that, "as in *Chamberlain*, the Commonwealth 'argued that the evidence and the reasonable inferences [drawn] therefrom led to the conclusion that [Clancy] was a murderer'"). The PCRA court also found that the prosecutor's comments that Clancy was "cold and collected" and "cold blooded" were permissible, because they advocated that Clancy killed Rigins with the malice required for first-degree murder. *Id.* at 11-12 (quoting *Commonwealth v. Hall*, 701 A.2d 190, 200 (Pa. 1997) (holding that the statements that "the only thing colder than the grave of [the victim] is this guy's heart" and that "he walked out coolly, calmly, and collected" were permissible to demonstrate malice)).

The PCRA court next rejected Clancy's reliance upon *Commonwealth v. Capalla*, 185 A. 203 (Pa. 1936), in which this Court held that it was reversible misconduct for a prosecutor to refer to the defendant as a "cold blooded killer." *Id.* at 12-13 (citing *Capalla*, 185 A. at 205). Pointing out that this Court has not cited *Capalla* since 1987, the PCRA court opined that *Chamberlain* and *Hall* "modified" *Capalla* "*sub silentio.*" *Id.* at 13. The

---

[3]     In evaluating the permissibility of the prosecutor's statements, the PCRA court did not specifically discuss the "dangerous man" comment. *See* PCRA Ct. Op. at 7-17. Rather, the court addressed that statement generally within a list of comments that Clancy challenged. *Id.* at 10.

court then noted that the Merriam-Webster dictionary defines "in cold blood" as "with premeditation: deliberately," and found as follows:

> [R]eferring to a defendant in a murder trial as a "murderer" or "killer," or a killing as "cold blooded," may be regarded as oratorical [flair] where there is sufficient evidence to support the allegations that the defendant killed the victim in the case. The context in this case should be particularly noted. The sole issue presented to the jury was whether [Clancy] was guilty of voluntary manslaughter due to provocation or murder of the first degree. [Clancy's] trial counsel argued strenuously and repeatedly that [Clancy] could only be found guilty . . . of voluntary manslaughter. In this context, the prosecutor's reference to a "cold blooded" killing could well be regarded by the lay person and jury member as argument that the killing was not due to provocation but rather a "willful, deliberate and premeditated killing."

*Id.* (citing 18 Pa.C.S. § 2502; [*In Cold Blood*,] MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 224 (10th ed. 1995)). The PCRA court explained that, in light of Clancy's defense that he killed Rigins in "hot blood," the prosecutor's remarks were "reasonable arguments based upon the evidence at trial and fair responses to [Clancy's] own arguments that preceded it." *Id.* at 16-17.

Finally, the PCRA court pointed out that, even if those statements constituted prosecutorial misconduct, Clancy had failed to prove the other elements of his ineffective assistance of counsel claim. The court determined that, based upon the foregoing case law and Attorney Valsamidis' testimony at the PCRA hearing, Clancy's trial counsel had reasonable strategic bases for declining to object during the prosecution's closing argument. As for prejudice, the court reasoned that:

> [Clancy] claims if only he had not been called a killer, the trial would have been different. [Clancy] was on trial for murder. The very nature of the charges is an allegation that [Clancy] killed someone. There was no evidence or implication that [Clancy] had killed before or that he had a reputation for killing. No reasonable person in the context of this case could have concluded that the Commonwealth was arguing anything other than the murder charge alleged, to wit, that [Clancy] killed the victim.

\*       \*       \*

[Clancy] asserts that referring to him as "cold blooded" incited the jury to act out of passion rather than according to the evidence. [Clancy] himself admitted the killing, and claimed as his defense that it was provocation, not planning, that led to the killing. Thus, to contrast a pair of euphemisms, the question before the jury was whether the killing was "cold blooded" or "hot blooded." Was it an "intentional killing" that was "willful, deliberate [or] premeditated," or did [Clancy] act out of "a sudden and intense passion resulting from serious provocation"? 18 Pa.C.S. §§ 2502, 2503. Given the volume of evidence in this case, it cannot be said that using a figure of speech, "cold blooded," to describe what the Commonwealth argued was a deliberate killing was prejudicial in this case.

*Id.* at 45-46 (citation modified). The PCRA court concluded that, because the evidence of his guilt was "overwhelming," Clancy had not been prejudiced by the prosecutor's remarks. *Id.* at 46.

In a unanimous, unpublished decision, the Superior Court affirmed the PCRA court's order denying Clancy's PCRA petition. *Commonwealth v. Clancy*, 1037 WDA 2016, 2017 WL 696836 (Pa. Super. Feb. 22, 2017). Quoting the PCRA court's discussion of prosecutorial misconduct *verbatim*, the Superior Court found that, based upon the record, Clancy had failed to demonstrate that the prosecutor's statements had an adverse effect on the outcome of his trial. *Id.*, slip op. at 16-21, 30. The Superior Court held that, because Clancy had not demonstrated prejudice, his ineffectiveness claim failed. Clancy timely sought allowance of appeal from this Court.

We granted Clancy's Petition for Allowance of Appeal, rephrasing the issues for review as follows:

(1) Where, in closing argument, the district attorney characterized [Clancy] as a "cold blooded killer" and a "dangerous man," did the district attorney violate the ruling of this Court announced in *Commonwealth v. Capalla*, 185 A. 203, 205 (Pa. 1936)?

(2) Were the district attorney's characterizations of [Clancy] during closing argument permissible oratorical emphasis consistent with Pennsylvania

Rules of Professional Conduct 3.4(c) and [American Bar Association ("ABA")] Standards for Criminal Justice 3-5.8?[4]

*Commonwealth v. Clancy*, 170 A.3d 1038 (Pa. 2017) (*per curiam*).  These questions call upon this Court to clarify the bounds of permissible oratorical flair within a prosecutor's closing argument.

In order to determine the point at which a prosecutor's statements exceed these bounds, we first must review the role of the prosecutor.  We have long understood that the prosecutor's role is threefold; she serves as an "officer of the court," as an "administrator of justice," and as an "advocate." *Commonwealth v. Starks*, 387 A.2d 829, 831 (Pa. 1978) (quoting CRIMINAL JUSTICE STANDARDS FOR THE PROSECUTION FUNCTION § 3-1.2(a) (AM. BAR ASS'N 1971));[5] *see Appeal of Nicely*, 18 A. 737, 738 (Pa. 1889) (describing a prosecutor as an officer of the court who is responsible for seeking "equal and impartial justice" on behalf of the Commonwealth).

As an officer of the court, the prosecutor has the responsibility to serve the public interest and to "seek justice within the bounds of the law, not merely to convict."  *Starks*, 387 A.2d at 831.  Because it is her duty both to respect the rights of the defendant and to enforce the interests of the public, the prosecutor "is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  The prosecutor must ensure that "the defendant is accorded procedural justice [and] that guilt is decided upon the

---

[4]     Clancy refers to Section 5.8 of the first edition of the ABA Standards, which most closely corresponds to Section 6.8 of the most recent edition, entitled "Closing Arguments to the Trier of Fact."  *Compare* CRIMINAL JUSTICE STANDARDS FOR THE PROSECUTION FUNCTION § 3-5.8 (AM. BAR ASS'N 1971) *with* CRIMINAL JUSTICE STANDARDS FOR THE PROSECUTION FUNCTION § 3-6.8 (AM. BAR ASS'N 2015) ("ABA Standards").

[5]     In *Starks*, this Court noted that, "[w]ith respect to the closing argument of the lawyer for the Commonwealth, we have expressly adopted the rationale of the [ABA Standards]."  *Starks*, 387 A.2d at 831.

basis of sufficient evidence." Pa.R.P.C. 3.8 cmt. 1; *see also* MODEL RULES OF PROF'L CONDUCT 3.8 cmt. 1 (AM. BAR ASS'N 2015) ("ABA Model Rules").

As an "administrator of justice," the prosecutor has the power to decide whether to initiate formal criminal proceedings, to select those criminal charges which will be filed against the accused, to negotiate plea bargains, to withdraw charges where appropriate, and, ultimately, to prosecute or dismiss charges at trial. *See, e.g.*, 16 P.S. § 1402(a) ("The district attorney shall sign all bills of indictment and conduct in court all criminal and other prosecutions. . . ."); Pa.R.Crim.P. 507 (establishing the prosecutor's power to require that police officers seek approval from the district attorney prior to filing criminal complaints); Pa.R.Crim.P. 585 (power to move for *nolle prosequi*); *see also* ABA Standards §§ 3-4.2, 3-4.4. The extent of the powers enjoyed by the prosecutor was discussed most eloquently by United States Attorney General (and later Supreme Court Justice) Robert H. Jackson. In his historic address to the nation's United States Attorneys, gathered in 1940 at the Department of Justice in Washington, D.C., Jackson observed that "[t]he prosecutor has more control over life, liberty, and reputation than any other person in America. His discretion is tremendous." Robert H. Jackson, *The Federal Prosecutor*, 31 AM. INST. CRIM. L. & CRIMINOLOGY 3, 3 (1940).[6] In fact, the prosecutor is afforded such great deference that this Court and the Supreme Court of the United States seldom interfere with a prosecutor's charging decision. *See, e.g.*, *United States v. Nixon*, 418 U.S. 683, 693 (1974) (noting that "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case"); *Commonwealth v. Stipetich*,

---

[6] Over the course of his career, Justice Robert Jackson developed ample perspective on the power vested in the prosecutor. Not only did Justice Jackson serve as the Attorney General of the United States, but he later would interrupt his service as a Justice on the High Court in order to serve at President Truman's request as Chief United States Prosecutor at the Nuremberg Trials, where he prosecuted Nazi war criminals. *See generally* Henry T. King, Jr., *Robert Jackson's Vision for Justice and Other Reflections of a Nuremberg Prosecutor*, 88 GEO. L.J. 2421, 2423 (2000).

652 A.2d 1294, 1295 (Pa. 1995) (noting that "the ultimate discretion to file criminal charges lies in the district attorney").

As an advocate, the prosecutor generally is free to "[assert] the client's position under the rules of the adversary system." 204 Pa. Code § 81.1. Like all attorneys, prosecutors are bound by the restrictions upon argument set forth in our Rules of Professional Conduct, which provide:

> A lawyer shall not . . . when appearing before a tribunal, assert the lawyer's personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused; but the lawyer may argue, on the lawyer's analysis of the evidence, for any position or conclusion with respect to the matters stated herein. . . .

Pa.R.P.C. 3.4(c). Moreover, Section 3-6.8 of the ABA Standards states that:

> (a) In closing argument to a jury (or to a judge sitting as trier of fact), the prosecutor should present arguments and a fair summary of the evidence that proves the defendant guilty beyond reasonable doubt. The prosecutor may argue all reasonable inferences from the evidence in the record, unless the prosecutor knows an inference to be false. The prosecutor should, to the extent time permits, review the evidence in the record before presenting closing argument. The prosecutor should not knowingly misstate the evidence in the record, or argue inferences that the prosecutor knows have no good-faith support in the record. The prosecutor should scrupulously avoid any reference to a defendant's decision not to testify.
>
> (b) The prosecutor should not argue in terms of counsel's personal opinion, and should not imply special or secret knowledge of the truth or of witness credibility.
>
> (c) The prosecutor should not make arguments calculated to appeal to improper prejudices of the trier of fact. The prosecutor should make only those arguments that are consistent with the trier's duty to decide the case on the evidence, and should not seek to divert the trier from that duty.
>
> (d) If the prosecutor presents rebuttal argument, the prosecutor may respond fairly to arguments made in the defense closing argument, but should not present or raise new issues. If the prosecutor believes the defense closing argument is or was improper, the prosecutor should timely object and request relief from the court, rather than respond with arguments that the prosecutor knows are improper.

ABA Standards § 3-6.8.[7]

Moreover, in consideration of their broad powers and discretion, prosecutors are required to fulfill certain special responsibilities, such as disclosing exculpatory information to the defense. *See* Pa.R.P.C. 3.8(d); *Brady v. Maryland*, 373 U.S. 83, 87-88 (1963) ("A prosecution that withholds evidence on demand of an accused . . . helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice.").[8] It has long

---

[7]     *See also* Pa.R.P.C. 3.3 (providing that all attorneys have a duty of candor toward a tribunal, must disclose adverse legal authority to the tribunal, and must not offer evidence that the attorney knows to be false).

[8]     Rule 3.8 of Pennsylvania's Rules of Professional Conduct states that:

The prosecutor in a criminal case shall:

(a) refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause;

(b) make reasonable efforts to assure that the accused has been advised of the right to, and the procedure for, obtaining counsel and has been given reasonable opportunity to obtain counsel;

(c) not seek to obtain from an unrepresented accused a waiver of important pretrial rights, such as the right to a preliminary hearing;

(d) make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal; and

(e) except for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose, refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused and exercise reasonable care to prevent investigators, law enforcement personnel, employees or other persons assisting or associated with the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under Rule 3.6 or this Rule.

been settled in Pennsylvania law that a prosecutor "should, at all times, conduct the [C]ommonwealth's case fairly, present it in an impartial manner, and avoid seeking to influence the jury by arousing their prejudices." *Commonwealth v. Cicere*, 128 A. 446, 447-48 (Pa. 1925) (citing *Commonwealth v. Mazarella*, 124 A. 163 (Pa. 1924); *Commonwealth v. Bubnis*, 47 A. 748 (Pa. 1901); *Appeal of Nicely*, 18 A. 737 (Pa. 1889)).

While the prosecutor must be mindful of the foregoing principles at every stage of a criminal trial, this Court has focused upon prosecutorial conduct during closing argument as "a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with his office, but also because of the fact-finding facilities presumably available to him." *Commonwealth v. Cherry*, 378 A.2d 800, 804 (Pa. 1977). Indeed, in opining upon the extensive power enjoyed by prosecutors, Justice Jackson warned that, "[w]hile the prosecutor at his best is one of the most beneficent forces in our society, when he acts from malice or other base motives, he is one of the worst." Jackson, 31 AM. INST. CRIM. L. & CRIMINOLOGY at 3. Thus, for over one hundred years, this Court has endeavored to minimize the risk of prosecutorial misconduct by defining the boundary between permissible and impermissible statements in closing argument.

In 1916, this Court decided *Commonwealth v. Ronello*, 96 A. 826 (Pa. 1916), one of the first reported cases in which we found that allowance of a prosecutor's remark during closing argument constituted reversible error. During the murder trial in *Ronello*, the prosecutor had stated: "My own honest conviction is that [the defendant] did that dastardly deed." *Id.* at 829. Opining that a prosecutor may not assert his personal belief in the guilt of the defendant, this Court concluded that the remark was "wholly

---

Pa.R.P.C. 3.8.

inexcusable" and "so violative of the prisoner's right to a fair trial" that a new trial was necessary. *Id.*

Twenty years later, in the seminal case of *Commonwealth v. Capalla*, this Court built upon *Ronello* and, for the first time, established definitive limits to permissible prosecutorial statements. In *Capalla*, the defendant was on trial for murder, but he maintained that he shot the victim in self-defense. During closing argument, the prosecutor called the defendant "a cold blooded killer." *See Capalla*, 185 A. at 204. Noting that the remark at issue differed only slightly from the prosecutor's impermissible expression of belief in *Ronello*, the *Capalla* Court explained that:

> It is no part of a district attorney's duty, and it is not his right, to stigmatize a defendant. He has a right to argue that the evidence proves the defendant guilty as charged in the indictment, but for the district attorney himself to characterize the defendant as 'a cold blooded killer' is something quite different. No man on trial for murder can be officially characterized as a murderer or as 'a cold blooded killer,' until he is adjudged guilty of murder or pleads guilty to that charge. . . . [The prosecutor's] statement was equivalent to an expression of belief on the part of the district attorney that the defendant was guilty of murder in the first degree. There are no facts in the record warranting any such belief on the part of any one, and even if there were, the first officials who had the right to give expression to that belief were the jurors after the case was committed to their keeping.

*Id.* at 205-06. Concluding that the statement constituted reversible error, this Court held that "[t]he application of epithets to a defendant on trial, and expressions of personal belief in a defendant's guilt have no legitimate place in a district attorney's argument." *Id.* at 206.

The *Capalla* Court did not discuss the prosecutor's role as an advocate, focusing little attention upon the concern of other courts at the time that, in the words of Judge Learned Hand, "[t]o shear [the prosecutor] of all oratorical emphasis, while leaving wide latitude to the defense, is to load the scales of justice." *Di Carlo v. United States*, 6 F.2d 364, 368 (2d Cir. 1925), *cert. denied*, 268 U.S. 706 (1925). Instead, the *Capalla* Court

emphasized the role of the prosecutor as an officer of the court, stressing the prosecutor's duty to present the Commonwealth's case impartially.[9] While this Court recognized that a prosecutor must be able to make arguments that are based upon the evidence, we characterized the "cold blooded killer" remark as an impermissible term of abuse that was divorced from the record. *Capalla*, 185 A. at 205-06.

In decisions following *Capalla*, we displayed little tolerance for terms that, in the view of this Court, amounted to an expression of the prosecutor's personal belief about the defendant's guilt. In *Commonwealth v. Lipscomb*, 317 A.2d 205 (Pa. 1974), we "emphatically condemned" the prosecutor's characterization of the defendants as "hoodlums" and "animals," holding that those remarks constituted "personal assertions" that went "beyond the scope of fair play." *Id.* at 207. We concluded that, in using those epithets, the prosecutor impermissibly expressed his personal belief in the guilt of the defendants. *Id.* (citing *Capalla*, 185 A. at 206). We similarly have held that characterizing a defendant as "the leader of this pack of murderers," *Commonwealth v. Joyner*, 365 A.2d 1233, 1235 (Pa. 1976), as a "vicious, desperate criminal who would kill for a nickel," *Commonwealth v. Smith*, 385 A.2d 1320, 1323 (Pa. 1978), or as an "executioner," *Commonwealth v. Anderson*, 415 A.2d 887, 889 (Pa. 1980), constituted unduly prejudicial statements by the prosecutor.

---

[9] *See Capalla*, 185 A. at 205-06 (quoting *Appeal of Nicely*, 18 A. at 738) (noting that a prosecutor "should not press upon the jury any deductions from the evidence that are not strictly legitimate" because "[w]hen he exceeds this limit, and in hot zeal seeks to influence them by appealing to their prejudices, he is no longer an impartial officer, but becomes a heated partisan"); *id.* at 206 (quoting *Bubnis*, 47 A. at 749) ("In his official capacity, clothed with the gravest responsibilities, and exercising functions in a measure judicial, the district attorney should ever be cautious in expressing to a jury his belief in the guilt of the accused. If convinced of it, his duty is to lead them to his own judgment by pointing out to them, intelligently and impartially, the evidence which cannot fairly justify any other conclusion.").

We have since reinforced the principles that animated *Capalla* with our disciplinary rules and our citation of the ABA Standards on prosecutorial conduct. *See Commonwealth v. Cronin*, 346 A.2d 59, 61-62 (Pa. 1975).[10] In fact, we have expressly adopted the rationale underlying the ABA Standards with respect to the prosecution's closing argument. *See Starks*, 387 A.2d at 831-32. While we recognized that the prosecutor must have reasonable latitude to present the Commonwealth's case fairly, we stressed in *Cronin* that a distinction exists between permissible use of "oratorical emphasis" and impermissible "indulge[nces] in personal assertions of guilt of a defendant either by direct statement or indirectly by figure of speech." *Cronin*, 346 A.2d at 62 (quoting *Di Carlo*, 6 F.2d at 368). Because the prosecutor's duties as an officer of the court involve seeking impartial justice, this Court primarily has focused upon the conduct of the prosecutor and the substance of the language itself. Although our standard of review for prosecutorial misconduct claims has been well-established since the early

---

[10] Specifically, we stated that:

> Our decisions in the cases cited above [*e.g.*, *Lipscomb*] were declaratory of Disciplinary Rule DR 7-106(C)(4) of the Code of Professional Responsibility, which provides: '(C) In appearing in his professional capacity before a tribunal, a lawyer shall not: . . . (4) Assert his personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant, [o]r as to the guilt or innocence of an accused; but he may argue, on his analysis of the evidence, for any position or conclusion with respect to the matters stated herein.' 438 Pa. xxv, ci-cii (1970) (emphasis supplied). *See also* American Bar Association Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function, 5.8(b) (Approved Draft, 1971).

*Cronin*, 346 A.2d at 61-62 (footnote omitted). Section 5.8(b) of the ABA Standards previously stated that, "[i]t is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." ABA Standards § 5.8(b) (1971). Today, that section most closely corresponds to Section 3-6.8(b). *See* ABA Standards § 3-6.8(b) (2015) ("The prosecutor should not argue in terms of counsel's personal opinion, and should not imply special or secret knowledge of the truth or of witness credibility.").

twentieth century,[11] our earlier decisions placed little emphasis upon the prejudicial effect of the prosecutor's speech upon the jury. Generally, once we found that the statements at issue were epithets or personal assertions of guilt not based upon a good-faith discussion of the evidence, our analysis concluded. *See, e.g., Joyner*, 365 A.2d at 1237; *Smith*, 385 A.2d at 1323; *Anderson*, 415 A.2d at 890.

With regard to other types of remarks, however, we evaluated prosecutorial misconduct claims in the context of the "unavoidable prejudice test":

> [W]here the language of the district attorney is intemperate, uncalled for and improper, a new trial is not necessarily required. The language must be such that its unavoidable effect would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict. The effect of such remarks depends upon the atmosphere of the trial, and the proper action to be taken is within the discretion of the trial court.

*Commonwealth v. Stoltzfus*, 337 A.2d 873, 882 (Pa. 1975) (internal citations and quotation marks omitted).[12] In *Stoltzfus*, the prosecutor attacked the defendant's credibility during closing argument, stating that, "[i]f it weren't for the tragedy of this case, those lines would be some of the funniest lines in the court room, because they are utterly unbelievable." *Id.* at 881-82. Although we found that those remarks were "improper and should not have been uttered by the district attorney," we concluded that the trial court

---

[11] *See, e.g., Commonwealth v. Meyers*, 139 A. 374, 377 (Pa. 1927) ("Where, under all the circumstances of the case, the verdict rendered is a just one, the language of the prosecuting officer which will justify a reversal must be such that its unavoidable effect would be to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant, so that they could not fairly weigh in his behalf such circumstances of doubt, extenuation, or degree of guilt that may be present in the case, and thus make them unable to render a true verdict.").

[12] *See also Commonwealth v. M. Johnson*, 533 A.2d 994, 997 (Pa. 1987) (noting that "our rule governing the impact of prejudice in closing arguments is the 'unavoidable prejudice test' as best articulated in [*Stoltzfus*]").

did not abuse its discretion in refusing to declare a mistrial. *Id.* at 882. We reasoned that, because the district attorney's comments were "motivated by" and "commensurate with" defense counsel's attack upon the credibility of the Commonwealth's witnesses, the jury was not prejudiced. *Id.* Although *Capalla* largely had guided our evaluation of epithets and expressions of guilt through the early 1970s, following *Stoltzfus*, we diverged from the *Capalla* approach and began to conduct a two-part analysis, first determining whether the substance of the statement at issue was improper, and (if it was) then proceeding to apply the unavoidable prejudice test.[13]

In *M. Johnson*, the defendant asserted that, in drawing comparisons between the defendant and witnesses who had lied at trial, the prosecutor impermissibly expressed his belief in the defendant's guilt. *M. Johnson*, 533 A.2d at 995.[14] We first articulated the

---

[13] *See, e.g., Commonwealth v. Gilman*, 401 A.2d 335, 340-41 (Pa. 1979) (finding no prejudice where prosecutor commented upon what the victim's lifestyle could have been if she had lived during closing argument because, although the comments were "irrelevant to the case" and "should not have been made," the record, as a whole, did not "indicate a prejudicial atmosphere"); *Commonwealth v. Perkins*, 373 A.2d 1076, 1084-85 (Pa. 1977) (refusing to grant a new trial where prosecutor stated that the defendant's confession was true because, although the Court did not approve of them, the challenged remarks were in response to an attack upon the prosecutor by the defense); *Commonwealth v. Hoss*, 364 A.2d 1335, 1342-43 (Pa. 1976) (declining to order a new trial where the prosecutor attempted to mislead the jury through an "unjustified and improper" misstatement of the evidence because the remark was "isolated" and the court allowed defense counsel to tell the jury that the prosecutor's statement had no basis in the evidence).

[14] During closing argument, the prosecutor stated that:

They have been found guilty in any event. However, I cannot pick and choose my witnesses. Sure, I would like to have law-abiding citizens as witnesses. The problem is that crimes usually aren't committed in front of law-abiding citizens. It is other criminals who see crimes committed. They are the ones who see the crimes. Robert Ahlborn and Scott Dunn, they are criminals. They have lied. The defendant, Michael Johnson, is their friend. What does that tell you about Michael Johnson? Ask yourselves that. Who do criminals associate with?

*M. Johnson*, 533 A.2d at 995.

need to balance the prosecutor's roles as an officer of the court with her role as an advocate when evaluating prosecutorial conduct, stating that:

> A prosecutor, of course, must have reasonable latitude in presenting his case and must be free as well to make his arguments with logical force and vigor. In addition, we have ruled consistently that not every intemperate or improper remark by the prosecution requires a new trial.
>
> On the other hand, we have decided with equal clarity that there are lines of permissible conduct which cannot be crossed in the interests of basic fairness and justice. Because a jury tends to attach special importance to the Commonwealth's arguments, we are compelled to guard against utterances which unduly inflame and prejudice those members.

*Id.* at 996 (internal citations and quotation marks omitted). Addressing the substance prong of the two-part analysis, we explained that "we have drawn the first and brightest line at the point where the language and inferences of the summation no longer relate back to the evidence on the record." *Id.* We also recognized that, "[w]ithin this broad context, of course, we also permit prosecutorial comment which has been inspired by the improper closing arguments of defense counsel." *Id.*; *see Perkins*, 373 A.2d at 1086. Following a recitation of the principles set forth in *Capalla*, *Lipscomb*, and their progeny, we observed that "we have not hesitated to set aside personal prosecutorial assertions which lack a proper evidentiary foundation and which unjustly stigmatize the accused in the eyes of the jury." *Id.* Turning to the facts of the case, we concluded in *M. Johnson* that, by suggesting that the defendant was guilty by association, the prosecutor expressed "personal assertions constituting improper comment to the point where it cannot be argued reasonably that a curative instruction could wipe away the fault." *Id.* at 997. We further opined that, "[i]f this be not incurable prejudice, then such error does not exist at all, and our past decisions mean little more than babbling empty phrases in dark corners." *Id.*

Similarly, in *Commonwealth v. D'Amato*, 526 A.2d 300 (Pa. 1987), we applied the two-part test to evaluate the prosecutor's closing argument characterization of the defendant as a "clever, calculating, and cunning executioner." *Id.* at 313. We held that, although the prosecutor "used poor judgment," the prosecutor's isolated remark did not prejudice the jury such that it could not weigh the evidence properly. *Id.* We observed that the prosecutor uttered that remark in response to opposing counsel's portrayal of the defendant as an uneducated man who was tricked into giving the confession at issue in the case. *Id.* We noted that the defense suggested that the police officers involved in the case were "sophisticated interrogators with psychological expertise who 'extracted' a confession" with threats to prosecute the defendant's family for aiding and abetting his escape. *Id.* Against that background, the prosecutor's isolated remark did not prejudice the defendant. *Id.* Nevertheless, we expressly reprimanded the prosecutor, emphasizing her duty as an officer of the court:

> Before we leave the subject matter of prosecutorial misconduct, we note that, while [the prosecutor's] conduct and arguments did not rise to the level that would unduly prejudice [the defendant] or deprive him of a fair trial, we are troubled by some of her remarks and comments, particularly . . . the "executioner" remark. As an officer of the court and an instrument of the criminal justice system, the prosecutor's duty is to seek justice, not simply convictions. The prosecutor's conduct at trial must be tempered by this dual responsibility. We will not hesitate, in appropriate cases, to refer matters of improper trial conduct of either the defense attorney or the prosecutor to the disciplinary board where the record suggests that the Code of Professional Responsibility may have been transgressed.

*Id.* at 314 (emphasis omitted).

In *Commonwealth v. J. Johnson*, 588 A.2d 1303 (Pa. 1991), a rape case, the defendant denied having any sexual contact with the victim. During closing argument, the prosecutor repeatedly referred to the defendant as a liar, detailing the ways in which his version of events differed from the evidence presented. We first observed that "the outcome in this case involved a credibility determination by the jury," and that "[t]he jury

was acutely aware that the victim's and [defendant's] stories conflicted." *Id.* at 1307. Finding that the prosecutor's remarks were tied to the crime at issue and the underlying evidence presented, we noted that "[h]ere, the prosecutor's comments that [the defendant] had lied were given in response to defense counsel's comments regarding the credibility of the victim and were supported by the evidence." *Id.* at 1305. We explained that "defense counsel quite clearly indicated his belief that one of the prosecution witnesses was in fact lying. The prosecutor then responded to this attack on one of the Commonwealth's witnesses." *Id.* at 1307. Thus, we concluded that, in light of the evidence and defense counsel's arguments, the prosecutor's remarks were neither unfair nor prejudicial. *Id.* In so doing, we stressed that we premised our decision upon the particular facts of the instant case and the context in which the challenged remarks were made:

> To reiterate, we conclude only that because of the unusual circumstances presented in the instant case, the prosecutor's comments were neither unfair nor prejudicial. In so holding, we do not wish to sanction the use of the terms, "you lied." A prosecutor must act properly during the entire trial. His or her conduct during trial should neither be vindictive nor should he or she attempt in any manner whatsoever to influence the jury by arousing their prejudices.

*Id.* at 1308. Although we did not focus solely upon the substance of the remark, as we had in *Capalla*, we recognized that the prosecutor's responsibilities as an officer of the court take precedence over her duties as an advocate. Thus, our decisions in *M. Johnson*, *D'Amato*, and *J. Johnson* conveyed an unequivocal message to prosecutors that, even where misconduct might not result in a mistrial *per se*, this Court will not ignore instances in which a prosecutor violates her duties as a representative of this Commonwealth by utilizing epithets and personal assertions of belief during closing argument. At the same time, however, we recognized that prosecutors may be afforded some leeway in responding to defense counsel's arguments.

Over time, our precedents came to express greater recognition of the prosecutor's right to advocate, and our understanding of permissible prosecutorial conduct expanded. The propriety of the prosecutor's remarks no longer was confined to the words themselves, viewed in isolation, as in *Capalla*. Under the two-part test, our substance analysis centered upon the elements of the charges leveled against the defendant and the evidence necessary to prove those elements at trial. In conducting that analysis, we also evaluated whether the remarks fairly were made in response to defense counsel's arguments.

In *Hall*, for example, a capital murder case, we evaluated the prosecutor's statements that "the only thing colder than the grave of [the victim] is [the defendant's] heart" and that, after shooting a store clerk in the head, the defendant "walked out coolly, calmly, and collected, with a .357 revolver waving at patrons in the store." *Hall*, 701 A.2d at 200. Following the shooting, the defendant in that case had proceeded to drive from Coatesville to Philadelphia, to stop at a McDonald's restaurant, and to visit his daughter. *Id*. We stated that:

> Prosecutorial misconduct . . . will not be found where comments were based on evidence or proper inferences therefrom or were only oratorical flair. Moreover, in order to evaluate whether the comments were improper, we must look at the context in which they were made. We note that this is a relatively stringent standard against which [the defendant] must labor.

*Id*. at 198 (citation omitted). We pointed out that a conviction for first-degree murder requires malice, which can be demonstrated by evidence of "wickedness of disposition, hardness of heart, wanton conduct, cruelty, recklessness of consequences and a mind regardless of social duty." *Id*. at 200 (quoting *Commonwealth v. Wharton*, 607 A.2d 710, 720 (Pa. 1992)); *see* 18 Pa.C.S. § 2502. We reasoned that, in referring to the defendant's "cold heart," the prosecutor permissibly argued a reasonable inference that could be drawn from the evidence because he simply "recount[ed] the evidence produced at trial

and how this evidence showed that [the defendant] killed the victim with the necessary malice for first[-]degree murder." *Id.* (footnote omitted).

In *Chamberlain*, a murder case, the defendant claimed that he was innocent in the murder of his wife, and that the real killer framed him by committing the murder on the day that Chamberlain's wife would have been eligible for a no-fault divorce. *Chamberlain*, 30 A.3d at 395-96. During closing argument, the prosecutor referred to the defendant numerous times as a "murderer." *Id.* at 406.[15] Echoing *Capalla*, Chamberlain argued that the prosecutor's characterization was improper because, "at the time of the closing argument, he had not yet been adjudged guilty, and by referring to him as a murderer, the prosecutor attempted improperly to assume the role of fact-finder." *Id.* at 406; *see Capalla*, 185 A. at 205-06.

We first reiterated that, "[a]lthough a prosecutor may argue to the jury that the evidence establishes the defendant's guilt, arguments from personal opinion as to the guilt of the accused are not proper." *Id.* at 408 (citing, *inter alia*, *D'Amato*, 526 A.2d at 309; *Capalla*, 185 A. at 206). However, despite citing *Capalla*, we concluded that, viewed

---

[15]   The prosecutor stated:

[F]or the time we have been here together, hearing this evidence, we've been in the presence of a murderer.

*        *        *

Say to him, when you will come back, through your foreperson, and then as I called upon you earlier, each and every one of you to rise, as is your duty, say to him that beyond any reasonable doubt, the law, when applied to the facts in this case, says to him what [the victim] said that night. What his heart, violence and motive, horror and ability and willingness and awesome lack of concern for anybody by his own evil deed, say to him, say to him what I say now, that when you rise you will announce before God and this court and us that you, Terry Chamberlain, are guilty of taking human lives. You're guilty of murder. You are a murderer.

*Chamberlain,* 30 A.3d at 406.

in context, the prosecutor's use of "murderer" did not constitute an improper expression of the prosecutor's opinion. *Id.* We reasoned:

> [T]he prosecutor did not merely label [Chamberlain] a murderer. Rather, he argued that the evidence and the reasonable inferences therefrom led to the conclusion that [Chamberlain] was a murderer. By asserting that the evidence led to the conclusion that [Chamberlain] was guilty, the prosecutor did not advocate his personal belief of [Chamberlain's] guilt. The prosecutor is free to argue that the evidence leads to the conclusion of guilt, and is permitted to suggest all favorable and reasonable inferences that arise from the evidence.

*Id.* (internal citations omitted). Thus, since *D'Amato*, this Court has tolerated harsh characterizations of the defendant when they are germane to the law that applies to the case at hand and to a particular element of an offense at issue. Moreover, in determining whether the prosecutor's statement is proper, this Court has made clear that, where applicable, we must consider whether the contested remarks constitute a fair response to the arguments of the defense.

The foregoing overview of the roles of the prosecutor and the cases in which this Court has addressed the duties and rights that attend those roles reveals that the definition of permissible oratorical flair has broadened over time, as this Court's emphasis has shifted to comprehend the role of a prosecutor not only as an officer of the court but as an advocate as well. As a result, the distinct line between permissible oratorical flair and improper expressions that had been drawn in *Capalla* has become somewhat blurred. Although we find no profound flaw in our body of precedent, it nonetheless appears that our jurisprudence, as it relates to the propriety of a prosecutor's closing argument, requires clarification.

Since *Capalla*, this Court and others have sought to strike a fair balance between the prosecutor's rights and responsibilities during closing argument.[16] The ABA Standards Relating to the Prosecution Function, which this Court expressly adopted in the 1970s "[w]ith respect to the closing argument of the lawyer for the Commonwealth," *Starks*, 387 A.2d at 831, state that the prosecutor may "argue all reasonable inferences from the evidence in the record" and "respond fairly to arguments made in the defense closing argument." ABA Standards §§ 3-6.8(a), (d). Moreover, our Rules of Professional Conduct, which this Court adopted in 1987, simultaneously impose heightened ethical obligations upon prosecutors, while recognizing that prosecutors nonetheless function as advocates for the Commonwealth. *Compare* Pa.R.P.C. Preamble [2] ("As advocate, a lawyer zealously asserts the client's position under the rules of the adversary system.") *with* Pa.R.P.C. 3.8 cmt. 1 ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate."). Because the prosecutor must have "reasonable latitude" to argue the defendant's guilt, *Cronin*, 346 A.2d at 62, the underlying issues and elements at trial dictate the bounds of permissible argument.

To assess prosecutors' adherence to these principles, we have required Pennsylvania courts to evaluate both the substance of the challenged remark and its effect upon the jury. *See, e.g., M. Johnson*, 533 A.2d at 996-97. We discern no reason to depart from this approach.[17] The two-part analysis provides a practical framework for

---

[16] *See, e.g.*, Rory K. Little, *The ABA's Project to Revise the Criminal Justice Standards for the Prosecution and Defense Functions*, 62 HASTINGS L.J. 1111, 1113 (2011) (noting that "[b]alanced representation is the goal" of the ABA Standards for Criminal Justice).

[17] In her Concurring Opinion, Justice Donohue cogently argues that this Court's standard for evaluating claims of prosecutorial misconduct has grown too permissive, and that we should return to our approach in *Capalla*. However, Justice Donohue readily concedes that "our more recent cases have largely abandoned the sound principles set forth in [*Capalla*]." Concurring Opinion (Donohue, J.) at 5. Although we appreciate the

evaluating prosecutorial remarks in which a fair balance may be struck between the prosecutor's duties as an officer of the court and his rights as an advocate.

The substance prong requires a court to examine the challenged remark in the context of the issues presented at trial. *See D'Amato*, 526 A.2d at 313. The court first must determine whether the remark reasonably relates to the facts of the case. *See Joyner*, 365 A.2d at 1237. A statement is impermissible "where the language and inferences of the summation no longer relate back to the evidence on the record." *M. Johnson*, 533 A.2d at 996. Upon finding that the statement at issue has a reasonable evidentiary foundation, the court next must determine whether the statement facilitates "the trier's duty to decide the case on the evidence." ABA Standards § 3-6.8(c). The remark not only must be based upon the evidence; it also must bear relevance to the crimes at issue.[18] Merely derogatory, *ad hominem* characterizations of the defendant or defense counsel are beyond the bounds of permissible advocacy; the prosecutor's comments must be tethered to the elements of the charged offenses and the evidence offered to prove those elements, and also should be tailored to a fair and reasonable rebuttal of the arguments advanced by the defense.

---

concerns that Justice Donohue has articulated, to view the instant case as merely a straightforward application of *Capalla* would require us to overlook, if not expressly overrule, volumes of binding precedent developed through the intervening decades. Rather than providing an "apologia" for the asserted flaws of our jurisprudence, as Justice Donohue deems this Opinion, *id.* at 7, we simply have sought herein to summarize and apply the law as it exists today, particularly as viewed through the lens of a claim asserting the ineffectiveness of counsel—a claim which "must be judged under the existing law at the time of trial" because "counsel cannot be deemed ineffective for failing to predict future developments or changes in the law." *Commonwealth v. Spotz*, 896 A.2d 1191, 1246 (Pa. 2006) (quoting *Commonwealth v. Todaro*, 701 A.2d 1343, 1346 (Pa. 1997)).

[18]    Although we offer no specific example, we do not foreclose the possibility that a prosecutor's comment may relate to an element of a charged offense and the evidence offered in support thereof, but nonetheless be "intemperate, uncalled for and improper," *Stoltzfus*, 337 A.2d at 882, such that an assessment of the prejudicial effect of the statement would be necessary.

However, "there is no *per se* rule which requires the grant of a new trial whenever the district attorney acts improperly." *M. Johnson*, 553 A.2d at 997. If the court determines that the statement was improper, it must then evaluate the effect of the remark pursuant to the unavoidable prejudice test:

> [W]here the language of the district attorney is intemperate, uncalled for and improper, a new trial is not necessarily required. The language must be such that its unavoidable effect would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict. The effect of such remarks depends upon the atmosphere of the trial, and the proper action to be taken is within the discretion of the trial court.

*Stoltzfus*, 337 A.2d at 882.

Having clarified the applicable test for evaluating prosecutorial statements, we now turn to the instant case. When reviewing a denial of PCRA relief, we must determine whether the PCRA court's factual findings are supported by the record, and whether its conclusions of law are free from legal error. *Commonwealth v. Williams*, 141 A.3d 440, 452 (Pa. 2016). Our scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party. *Id.* Although we are bound by credibility determinations, we apply a *de novo* standard of review to legal conclusions. *Commonwealth v. Roney*, 79 A.3d 595, 603 (Pa. 2013). This Court recently has explained that:

> [T]o obtain relief under the PCRA based on a claim of ineffectiveness of counsel, PCRA petitioner must satisfy the performance and prejudice test set forth in *Strickland*. In Pennsylvania, we have applied the *Strickland* test by requiring a petitioner to establish that: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability that the result of the proceeding would have been different. *Pierce*, 786 A.2d at 213. Counsel is presumed to have rendered effective assistance, and, if a claim fails under any required prong of the *Strickland* test, the court may dismiss the claim on that basis. *Commonwealth v. Ali*, 10 A.3d 282, 291 (Pa. 2010).

*Commonwealth v. VanDivner*, 178 A.3d 108, 114 (Pa. 2018) (internal citations modified). "A reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceedings." *Commonwealth v. Collins*, 957 A.2d 237, 244 (Pa. 2008) (citing *Strickland*, 466 U.S. at 694).

In rejecting Clancy's argument that *Capalla* compels a finding that the "cold blooded killer" remark was reversible error, the PCRA court opined that our decisions in *Chamberlain* and *Hall* "modified" *Capalla* "sub silentio." *See* PCRA Ct. Op. at 13. The PCRA court determined that, because the prosecutor's characterization of Clancy during closing argument as a "dangerous man" and a "cold blooded killer" was permissible oratorical flair, Clancy's ineffective assistance of counsel claim lacked arguable merit. *Id.* at 14. Significantly, inasmuch as Clancy raises his argument in the context of an ineffective assistance of counsel claim, our inquiry focuses upon whether Attorney Valsamidis should have objected to the prosecutor's remarks.

Because Clancy specifically challenges the permissibility of the "cold blooded killer" remark pursuant to *Capalla*, we begin our analysis there. In 1936, the *Capalla* Court held that the prosecution's characterization of the defendant as a "cold blooded killer" constituted an impermissible expression of belief, reasoning that it was the role of the jury to determine guilt. *Capalla*, 185 A. at 205-06. We stressed that, as an officer of the court, "[i]t is no part of a district attorney's duty, and it is not his right, to stigmatize a defendant." *Id.* at 205. We drew a firm line in the sand, announcing that "[t]he application of epithets to a defendant on trial, and expressions of personal belief in a defendant's guilt have no legitimate place in a district attorney's argument." *Id.* at 206. In viewing the "cold blooded killer" remark strictly in reference to the prosecutor's role as an officer of the court, we paid little heed to Judge Learned Hand's concern that "[t]o shear [the

prosecutor] of all oratorical emphasis, while leaving wide latitude to the defense, is to load the scales of justice." *Di Carlo*, 6 F.2d at 368.

However, in *Hall*, we held that the prosecutor's reference to the defendant's "cold heart" was permissible. *See Hall*, 701 A.2d at 200. We recognized first that, in order to prove beyond a reasonable doubt that the defendant committed a first-degree murder, the prosecution must prove that the defendant acted with malice. *Id.* We explained that malice can be demonstrated by evidence of "wickedness of disposition, hardness of heart, wanton conduct, cruelty, recklessness of consequences and a mind regardless of social duty." *Id.* (citing *Wharton*, 607 A.2d at 720). We then reviewed the evidence in order to determine whether the remark was based upon the record. *Id.* We concluded that the defendant's ability to continue with his daily errands after killing the victim (*e.g.*, driving to McDonald's, visiting his daughter) supported the prosecution's "cold heart" remark, which reasonably could give rise to the inference that the defendant killed the victim with the necessary malice. *Id.* at 200 n.11. Similarly, in *Chamberlain*, we found that the prosecution's reference to the defendant as a "murderer" was permissible where the prosecutor merely suggested the conclusion that the jury should reach based upon the evidence. *Chamberlain*, 30 A.3d at 408. Notably, although we cited *Capalla* in setting forth the applicable law, we did not attempt to justify our apparent departure from its holding. *Id.* It is clear that *Capalla* is in tension with the principles that we later set forth in *Hall* and *Chamberlain*, which principles we now reaffirm in today's case.[19]

_____

[19] Although Justice Donohue similarly acknowledges that our later decisions departed from our approach in *Capalla*, she nonetheless maintains that *Capalla* "remained good law in this Commonwealth" until today's decision, which she characterizes as overruling *Capalla* for the first time. Concurring Opinion (Donohue, J.) at 7 n.5. To the contrary, herein we simply recognize what already is manifest in our jurisprudence—a clear inconsistency between *Capalla* and our more recent, binding precedent.

Consistent with our clear departure from *Capalla*'s rigid standard, and mindful of our concomitant allowance of oratorical flair, we hold that offense-centric statements generally are permissible. These are statements that speak to the elements of the particular charges levelled against the defendant and the evidence necessary to prove those elements at trial, such as those at issue in *Hall* and *Chamberlain*. The prosecutor must be free to argue that the facts of record establish every element of the crime charged, and must be free to respond fairly to the arguments of the defense. Thus, we should not preclude or condemn a prosecutor's characterizations of the defendant that are both based upon the record and that inherently inform elements of an offense at issue, especially where the remarks constitute a fair response to defense counsel's argument. However, when statements deteriorate into impermissible characterizations and inflammatory name-calling that are divorced from the record or irrelevant to the elements of the crime at issue, they are substantially unwarranted and must be scrutinized for prejudicial effect.

In the instant case, the Commonwealth sought a conviction for first-degree murder. Thus, the prosecutor had to prove both that Clancy killed Rigins and that he did so with specific intent to kill. *See* 18 Pa.C.S. § 2502(a); *Commonwealth v. Simpson*, 754 A.2d 1264, 1269 (Pa. 2000). Indeed, "[i]t is the specific intent to kill which distinguishes murder in the first degree from lesser grades of murder." *Id.* (citing *Commonwealth v. Smith*, 694 A.2d 1086, 1088 (Pa. 1997)). Clancy admitted to shooting Rigins, but contended that he accidentally had shot him while discharging the gun in the heat of passion. *See* N.T., Trial Vol. III, 4/11/2013, at 125 (Clancy testified that, "my anger took over me . . . I just pulled the gun out . . . I heard one bang, and then after that I just heard the click."). Thus, the only contested issue before the jury was whether Clancy's actions were willful, deliberate, and premeditated. *See* N.T., Trial Vol. IV, 4/12/2013, at 75-78; 18 Pa.C.S. §

2502(d) (defining "intentional killing" for purposes of first-degree murder as "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing").

The state of mind that must be proven in a murder prosecution is an abstraction that cannot be established merely by a recitation of the physical evidence in the case. Often, the defendant's state of mind can be established only by circumstantial proof and the jury's powers of deduction and inference. In confronting this evidentiary challenge, prosecutors require some latitude in their arguments to the jury. *See, e.g.*, *Commonwealth v. Mattison*, 82 A.3d 386, 392 (Pa. 2013) (noting that "[s]pecific intent to kill can be established through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body"). In cases like the one before us today, in which the defendant admits to the physical act of killing the victim but argues self-defense, or some lesser degree of culpability, it is especially important that we allow prosecutors to "respond fairly to arguments made in the defense closing argument." ABA Standards § 3-6.8(d).

The facts of the instant case are analogous to those in *Hall*, in which we evaluated the prosecutor's reference to the defendant's "cold heart." *Hall*, 701 A.2d at 200. Like the defendant in *Hall*, Clancy admitted to shooting Rigins at trial, but argued that he did not act with specific intent. The evidence of record established that, as Rigins attempted to flee, Clancy shot at Rigins' vital organs, just as the *Hall* defendant shot his victim in the head. Further, the surveillance video showed numerous bystanders running near Rigins, but Clancy did not hit any of them despite firing six rounds. The Commonwealth presented evidence showing that, after shooting Rigins, Clancy engaged in polite conversation with Susan Ours, bought a water bottle at a convenience store, and charged

his phone at his friend's house. In *Hall*, the Commonwealth offered similar evidence.[20]

Thus, as in *Hall*, in referring to Clancy as a "dangerous man" and a "cold blooded killer," the prosecutor asserted a reasonable evidentiary inference, one necessary to the Commonwealth's theory that Clancy intentionally killed Rigins, directly rebutting Clancy's defense counsel "strenuous[ ] and repeated[ ]" contentions to the contrary. *See* PCRA Ct. Op. at 13; *see Hall*, 701 A.2d at 200 (holding that, "the prosecutor's reference to [the defendant's] 'cold heart' was proper argument since he was merely arguing a reasonable inference which could be drawn from the evidence").

Finding that the prosecutor's statements had a reasonable evidentiary foundation, we now inquire as to whether those statements facilitate "the trier's duty to decide the case on the evidence." ABA Standards § 3-6.8(c). The sole issue before the jury was whether Clancy killed Rigins intentionally or whether Rigins had provoked him. *See* 18 Pa.C.S. §§ 2502(a), 2503. As the PCRA court observed, the term "in cold blood" denotes

---

[20]    In *Hall*, the prosecutor argued in closing as follows:

> And about this defendant, to understand his mindset, again, to get into his mind as to how he acted when he shot and killed [the victim], we also must look at what he did after. . . . After he was laughing, joking, showing guns, hey, you like this, he went back to Philly, he went back to McDonald's, he ate, went home, and then he went to visit his daughter. After he shot and killed a man, just went about as in every other perfect normal day. That tells you tons about his mind, what was in it.

> Ladies and gentlemen, I submit to you we have proven our case beyond a reasonable doubt. And I would like to end by stating that the only thing colder than the grave of [the victim], is this guy's heart. The only thing colder, because he put him there, and he made sure he was going there. Because if he didn't shoot the second time, we might not be here. But he wanted to put him there the first time, and the instinct saved him, and the second time there was no instinct in the world that could have saved him, because he intentionally shot and killed him. And he walked out coolly, calmly, and collected, with a .357 revolver waving at patrons in the store.

*Hall*, 701 A.2d at 200.

willfulness and premeditation, the state of mind required for a first-degree murder conviction. PCRA Ct. Op. at 13; *see Cold Blood*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("A killer's state of mind when committing a willful and premeditated homicide <a shooting in cold blood>"). Similarly, the term "dangerous" is understood as "likely to cause serious bodily harm," which speaks to specific intent to kill. *See Dangerous*, BLACK'S LAW DICTIONARY (10th ed. 2014). Moreover, as the PCRA court noted, "to contrast a pair of euphemisms, the question before the jury was whether the killing was 'cold blooded' or 'hot blooded.'" PCRA Ct. Op. at 45. In light of the theory advanced by the defense—that Clancy, enraged by losing the fight with Rigins, indiscriminately shot his gun in anger— the challenged remarks were a fair response to the defense argument that Clancy had killed Rigins in the heat of passion. *See J. Johnson*, 588 A.2d at 1305. The challenged remarks were confined to the evidence and the applicable law, and, in context, the remarks at issue were not "intemperate, uncalled for and improper." *See Stoltzfus*, 337 A.2d at 882. Thus, in the circumstances of this case, we hold that the prosecutor's characterization of Clancy as a "dangerous man" and a "cold blooded killer" constituted permissible (if aggressive) oratorical flair. As such, it is unnecessary to evaluate the remark's effect upon the jury.

In light of the foregoing, we find that Clancy's ineffectiveness claim lacked arguable merit. Pursuant to the two-part test that this Court adopted over forty years ago, the prosecutor's remarks were permissible in the particular, developed context of Clancy's trial.[21] As set forth in detail above, this Court explicitly has allowed "cold heart" and "killer"

---

[21] Although placing numerous other remarks at issue before the lower courts (*e.g.*, "cowardly killing," "snitch-free mentality"), Clancy exclusively calls for this Court to review the prosecutor's characterization of Clancy as a "dangerous man" and a "cold blooded killer." Therefore, we do not opine upon the propriety of any other aspect of the prosecutor's closing argument. To be clear, we do not intend for this decision to foreclose future challenges to prosecutorial conduct similar to those discussed, but not evaluated, herein.

references in cases bearing close factual similarities to the instant matter. *See Hall*, *Chamberlain*. Because the prosecutor's closing argument was not impermissible, Attorney Valsamidis cannot be deemed ineffective for declining to object.

We caution that our holding in this case should not be understood as a rubber stamp or seal of approval upon a prosecutor's use of invective or derogatory epithets masquerading as reasonable and relevant inferences. Today, we pay respect both to Judge Hand's concern that we not deprive the prosecutor "of all oratorical emphasis," *Di Carlo*, 6 F.2d at 368, and to Justice Jackson's warning that, "[w]hile the prosecutor at his best is one of the most beneficent forces in our society, when he acts from malice or other base motives, he is one of the worst." Jackson, 31 AM. INST. CRIM. L. & CRIMINOLOGY at 3. In light of the wide discretion and authority that a prosecutor enjoys in choosing the crimes with which to charge a person, *see, e.g.*, *Nixon*, 418 U.S. at 693; *Stipetich*, 652 A.2d at 1295, courts must ensure that prosecutors confine their advocacy to arguments relevant to the elements of the crimes that they placed at issue in the first instance.

We recognize as well the validity of the concerns expressed on prior occasions by Chief Justice Saylor, who has opined that "justice would be better served if the Court were to enforce a higher standard of professionalism and caution prosecutors to restrain themselves" by "confin[ing] themselves more closely to the evidence and the applicable law both in the presentation of evidence and in arguments to jurors." *Burno*, 94 A.3d at 978 (Saylor, J., concurring); *accord Commonwealth v. Cox*, 863 A.2d 536, 560 (Pa. 2004) (Saylor, J., concurring and dissenting). To uphold this standard, courts must thoroughly analyze challenged statements in the context of both the elements of the charges at issue and the evidence necessary to prove those elements at trial. Moreover, courts must evaluate whether the prosecutor's statements may be considered a fair response to defense counsel's arguments.

This analysis must extend beyond a cursory or perfunctory review of the record. For example, in a case in which the crime at issue does not require a showing of specific intent, a prosecutor's reference to the defendant as "cold blooded" would likely not be permissible, regardless of how much evidence on the record supports the statement. Similarly, it may not be proper to refer to a defendant as a "cold blooded killer" where the defense's argument does not warrant that reference. For example, where the defense in a first-degree murder trial is mistaken identity, rather than heat-of-passion, the term "cold blooded killer" may not be appropriate. Prosecutorial remarks do not constitute permissible oratorical flair simply because they are based upon the underlying facts of the case *or* because they relate to an underlying element of the crime. Both requirements must be met. To fulfill his duty as an advocate, a prosecutor has numerous tools in his arsenal. Recourse to inappropriate invective is not one of them.

For the foregoing reasons, we affirm the Superior Court's order.

Chief Justice Saylor and Justices Baer, Todd, Dougherty and Mundy join the opinion.

Justice Donohue files a concurring opinion.